MARITIME OVERSEAS CORPORA-
TION, Plaintiff, Appellee,

v.

NORTHEAST PETROLEUM INDUS-
TRIES, INC., Defendant, Appellant.

Nos. 82–1582, 82–1605.

United States Court of Appeals,
First Circuit.

Argued March 8, 1983.

Decided April 26, 1983.

Alan R. Hoffman, with whom Lynch, Brewer, Hoffman, & Sands, Boston, Mass., Solomon Sandler, and Sandler, Sandler & Laramee, Gloucester, Mass., were on brief, for defendant, appellant.

Astrid C. Glynn, with whom Richard A. Dempsey, and Glynn & Dempsey, Boston, Mass., were on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, BREYER, Circuit Judge, and MALETZ,* Senior Judge.

COFFIN, Chief Judge.

Appellant Northeast Petroleum Industries ("Northeast") appeals an award of indemnity to appellee Maritime Overseas Corporation ("Maritime") for a judgment paid by Maritime to an injured seaman in its employ and for Maritime's costs and attorney's fees in defending the seaman's suit. We hold that indemnity was not warranted but that appellee is entitled to contribution from appellant and remand to the district court to assess the comparative fault of the parties and to apportion damages accordingly.

## I. *Background*

James Kennedy was a crew member on the SS OVERSEAS EVELYN, which was owned and operated by appellee Maritime. He injured his knee and back when he slipped on the deck of the ship while the ship was moored at appellant Northeast's terminal discharging a cargo of light grade oil. Kennedy brought suit against Maritime claiming unseaworthiness of the vessel and negligence under the Jones Act, 46 U.S.C. § 688, as well as failure to pay maintenance and cure. Maritime gave notice of the suit to Northeast, but Northeast made no appearance to defend it. The jury's special verdict found that Maritime was negligent in a manner that played a part in causing Kennedy's injuries but that the vessel was not unseaworthy in a manner that caused his injuries.

Evidence presented at trial of Kennedy's claims tended to show that after shore hoses had been sent on board the ship and while crew members were connecting the hoses to the ship's manifold for discharge of the ship's hold of oil, one of the hoses spilled a large quantity of oil[1] onto the ship's deck. The ship's supervising employees spread "Absorb-N-Dry"—a gravel-like substance designed to absorb oil and give footing— over the area where the oil had spilled and then ordered the crew to resume connecting the hoses. There was contradictory testimony as to whether there should be a waiting period before working in an area in which Absorb-N-Dry has been applied.

Kennedy testified that after work had resumed, he and two or three other crew

---

* Of the United States Court of International Trade, sitting by designation.

1. Kennedy testified that there was from a half to a full barrel of oil on the deck, a barrel containing 55 gallons.

members were assigned to hold the hose and push it over to where the boatswain could connect it to the manifold. He further testified that when the boatswain failed to secure the connection, the hose recoiled causing him to lose his footing and fall, injuring his knee. He described "the gravel and the stuff on the ground" as "[s]lippery, like standing on a bunch of rocks moving around".

There was uncontradicted testimony at the indemnity trial that when a shore terminal sends a hose on board a ship for connecting to the ship's manifold that the hose should be empty of oil. On the basis of that testimony and on the record of Kennedy's trial against Maritime, which was entered as an exhibit in the indemnity trial, the district court concluded that Northeast's negligence caused Kennedy's injuries:

> "In order to return a verdict in favor of the seaman, the jury had to find as facts (1) that there was a measurable quantity of oil in the hose hoisted aboard plaintiff's ship, and (2) that the oil spilled on the deck caused the seaman's injury. Thus, the defendant is foreclosed from disputing these facts in this litigation, and the Court finds that plaintiff has proved negligence in defendant's failure to provide a hose, free of significant quantities of oil."

Finding further that Maritime was in no way actively negligent in a way that caused Kennedy's injuries, the court found that Maritime was entitled to indemnity from Northeast under tort principles. It therefore did not reach Maritime's further claim that it was entitled to indemnity because Northeast had breached its implied warranty of workmanlike performance of its contract or Maritime's claim, argued in a post-trial memorandum, that it had a right to contribution.

## II. Tort-based Indemnity

We have had occasion recently to summarize the prerequisites and limits of indemnification based on a tort theory. Tort-based indemnification,[2]

> "[d]esigned to shift the whole loss upon the more guilty of the two tortfeasors ... has usually been available only where the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault. 'Passive negligence' has been limited to instances in which the indemnitee was vicariously or technically liable. Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate." *Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Authority,* 693 F.2d 1, 3 (1st Cir.1982) (citations omitted).

Where, as here, a would-be indemnitee seeks to recover an amount paid in satisfaction of a previous judgment, it is bound by all the findings without which the previous judgment could not have been rendered. *Beetler v. Sales Affiliates, Inc.,* 431 F.2d 651, 654 (7th Cir.1970); *Warren Petroleum Corp. v. J.W. Green Contractors,* 417 F.2d 242, 245–46 (5th Cir.1969). In determining what findings were necessary to the judgment below, we must look to the entire record of that case. *Nordeutsher Lloyd, Brennan v. Brady-Hamilton Stevedor Co.,* 195 F.Supp. 680, 684 (D.Or.1981).

The trial court concluded here that the jury verdict in favor of Kennedy necessarily implied a finding that there was oil on the ship's deck and that the spilled oil caused Kennedy's injuries independently of any active negligence on Maritime's part. But examination of the judge's instructions and the jury's special verdict leads us to a different conclusion.

The judge instructed that the shipowner's absolute, nondelegable duty to provide a seaworthy vessel requires that "the deck

---

**2.** One court has suggested that the tort principle by which an actively negligent tortfeasor is required to indemnify a passively negligent tortfeasor, "developed to alleviate the harsh rule that prohibited apportionment among tortfeasors", has no function in a comparative fault system. *Loose v. Offshore Navigation Inc.,* 670 F.2d 493, 501–02 (5th Cir.1982).

must be a reasonably safe place to work, not unreasonably slippery .... [I]f you find the deck was unreasonably slippery, then you may find the vessel unseaworthy and the ship owner liable without any reference to the issue of negligence of the Defendant or any of its employees." Based on those instructions, the jury's special verdict found that the OVERSEAS EVELYN was not "unseaworthy in a manner that was a proximate cause of injuries to Mr. Kennedy."

The jury did, however, find that Maritime was negligent in a manner that played a part in causing Kennedy's injuries. Examination of the court's instructions[3] leaves no doubt that in order to return, as it did, a verdict for plaintiff on the Jones Act negligence count, the jury must have found active negligence on Maritime's part within the meaning of the tort-based theory of indemnification.

The court instructed the jury that it should find negligence under the Jones Act count "if [Maritime] committed some act or omission that played any part, no matter how small, in actually bringing about or causing injury to Mr. Kennedy." It indicated that "a failure to furnish [plaintiff] with a reasonably safe place to work" when "his working conditions could have been made safe through the exercise of reasonable care" would constitute negligence and specified, with respect to the condition of the deck:

"Should you find that the area on the deck of the vessel where the Plaintiff was injured was slippery because of the negli-

gence of the Defendant and that this condition caused Mr. Kennedy to be hurt, even though it caused it only in small part, you should find that the Defendant was negligent."

The court also indicated, making direct reference to the boatswain and the chief mate, that Maritime was responsible for any negligence on the part of its employees.

On the basis of the court's instruction and the evidence in the record the jury could have found Jones Act negligence in any of four ways. It could have found: (1) that the deck was slippery because of Maritime's negligence, either in allowing the oil to spill in large quantities from the connecting hose or in failing adequately to clean up that spill; and that the deck's slippery condition caused Kennedy's injuries in part though his injuries were not sufficiently a direct result of the slippery condition to find unseaworthiness;[4] (2) that the chief mate or other supervisory Maritime employees were negligent in ordering Kennedy back to work immediately after applying the Absorb-N-Dry; (3) that the boatswain was negligent in handling the connecting hose, allowing it to recoil and force Kennedy off-balance; or (4) that Maritime failed through its supervisory employees adequately to warn Kennedy of the dangers of working on the slippery deck after the Absorb-N-Dry had been applied.

Though the court's instructions to the jury emphasized the liberal standard of Jones Act negligence and its minimal causation requirement—"played any part, no matter how small, in bringing about or ac-

---

**3.** The jury answered the following question affirmatively: "Was Maritime Overseas Corp., its agents or employees negligent in a manner that played any part, even the slightest, in causing injuries to Mr. Kennedy?"

**4.** The jury was instructed that a stricter standard of causation obtained with respect to the claim of unseaworthiness:

"In this respect a different rule applies to proof of causation under the Jones Act than the rule applicable to a claim of unseaworthiness, that's why you will find these questions worded differently.

One question refers to negligence that played any part, even the slightest, because

under the Jones Act an injury or damage is considered caused by an act or failure to act whenever it appears from a preponderance of the evidence in the case that the act or omission played any part, no matter how small, in bringing about or actually causing the injury or damage.

However, with respect to Question 2 [unseaworthiness], it's necessary for the Plaintiff to show not only that the act or omission played a substantial part in bringing about or actually causing him hurt, but also that the injury was either a direct result or a reasonably probable consequence of the act or omission."

tually causing the injury or damage"—nothing in the court's instruction on the Jones Act count indicated that Maritime was strictly liable for Kennedy's safety. The jury's finding of negligence can only be taken to indicate its judgment that Kennedy's injuries resulted, at least in part, from acts or omissions on the part of Maritime. Such negligence is active negligence and precludes indemnity under a tort theory. *See Araujo, supra; Loose v. Offshore Navigation, Inc.,* 670 F.2d 493, 499–500 (5th Cir. 1982).

### III. *Contractual Indemnity*

■ A contractual right to indemnification is implied if there are "unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility for the plaintiff's safety, or when there is a generally recognized special relationship between the parties." *Araujo, supra,* 693 F.2d at 2, 3 (citations omitted). Beginning with the seminal case of *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1955), the special relationship between a stevedoring company and a shipowner has been held to imply that the stevedoring company warrants performance of its services in a workmanlike manner and will indemnify the shipowner for any liability resulting from a breach of that warranty of workmanlike service.[5]

■ The rationale for this implied indemnity arises from the shipowner's nondelegable duty to provide a seaworthy vessel coupled with the fact that a stevedoring company which takes control of the ship to unload it is, during the course of that operation, more capable than the shipowner of avoiding accidents. *See Italia Societa per Azoni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964). The shipowner's negligence does not bar such indemnity.

"[R]ecovery in indemnity for breach of the stevedore's warranty is based upon an agreement between the shipowner and the stevedore and is not necessarily affected or defeated by the shipowner's negligence, whether active or passive, primary or secondary." *Id.* at 321, 84 S.Ct. at 752; *see also Weyerhaeuser Steamship Co. v. Nacirema Operating Co.,* 355 U.S. 563, 567, 78 S.Ct. 438, 440, 2 L.Ed.2d 491 (1958).

But negligence on the part of the shipowner which prevents the stevedore from doing a workmanlike job, *see Gator Marine Towing Inc. v. J. Ray McDermott & Co.,* 651 F.2d 1096, 1100 (5th Cir.1981), may preclude indemnity.

Indemnity arising from an implied warranty of workmanlike service has also been applied to non-stevedoring service contracts with a shipowner. *See, e.g., Tebbs v. Baker-Whiteley Towing Co.,* 407 F.2d 1055, 1058 (4th Cir.1969) (towing contract); *United N.Y. Sandy Hook Pilots Ass'n v. Rodermond Industries,* 394 F.2d 65, 71 (2d Cir. 1968) (*Ryan* principles frequently extended to non-stevedore maritime contractors); *American Export Lines v. Norfolk Shipbuilding & Dry Corp.,* 336 F.2d 525 (4th Cir.1964) (shipyard service contract). Application of *Ryan* indemnity has "rested ... on elements of expertise, control, supervi-

---

**5.** The *Ryan* decision must be placed in the context of the earlier decisions in *Seas Shipping Co. v. Sieracke,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), which held that longshoremen are seamen to whom the shipowner owes a duty to provide a seaworthy ship, and *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), which held that a shipowner is not entitled to contribution from a stevedore as a joint tortfeasor. This left the shipowner in the "unenviable position" of being liable without fault when a longshoreman was "injured as a result of an unseaworthy condition caused

wholly by the stevedore's negligence." *Fairmont Ship Corp. v. Chevron International Oil Co.,* 511 F.2d 1252, 1255 (2d Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975). *Cooper Stevedoring Co. v. Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1973) limited *Halcyon* to instances in which the injured longshoreman is employed by the stevedore and thus, because of the limitations of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950, could not have proceeded directly against the stevedore in tort.

sion and ability to prevent accidents." *Fairmont Shipping Corp. v. Chevron International Oil Co., Inc.,* 511 F.2d 1252, 1257 (2d Cir.), cert. denied, 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975).

 Maritime argues that as a marine terminal operator Northeast "was bound to perform its services in a workmanlike manner." It is unclear, however, from what contract between what parties such duty arose. While it is true that a shipowner seeking indemnity need not have privity with the contractor against whom it seeks indemnity, *see Waterman Steamship Corp. v. Dugan & McNamara,* 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960), the nature and extent of an implied warranty of workmanlike service and any resulting indemnity depend upon the terms of the contract which gave rise to that warranty. *See, e.g., H & H Ship Service Co. v. Weyerhaeuser Line,* 382 F.2d 711, 712 (9th Cir.1967) ("warranty is a part of the contract ... and is implied to the extent of the work done and the contract exercised by the ship repairer").

 The most we can assume from the record before us is that there was an agreement by which Northeast would receive at its terminal a cargo of light grade oil. There is no evidence in the record that Northeast had a contractual duty to control or supervise the operation of unloading that cargo. The record shows that, in fact, apart from Northeast's sending connecting hoses onto the deck of the OVERSEAS EVELYN, Maritime was in complete control of the unloading operation insofar as it took place on the ship's deck with responsibility for connecting the hoses to the ship's manifold and discharging the ship's hold of oil. The injured seaman, Kennedy, was at all times directly under the supervision and control of Maritime and its employees.

The closest factual situation that we have found in which indemnity was held to arise from breach of a warranty of workmanlike service is that described in *Hartnett v. Reiss Steamship Co.,* 421 F.2d 1011 (2d Cir.), cert. denied sub nom. *Grain Handling Co., Inc. v. Hartnett,* 400 U.S. 852, 91 S.Ct. 49, 27 L.Ed.2d 90 (1970). In that case grain was unloaded from a ship to a grain elevator primarily "by use of a mechanical 'leg', essentially a series of buckets on an endless belt which scoop up the grain", which had been lowered from the grain elevator into the hold of the ship. The shipowner was sued by a longshoreman who was injured while entering the hold of the ship to move grain within reach of the mechanical leg. The shipowner successfully sought indemnity from the owner of the grain elevator.

"International [the owner of the grain elevator] contends that by means of its mechanical leg, it was merely accepting delivery of the cargo in its latter capacity [cosignee of the cargo], and was not engaged in unloading the ship with the Elevator's mechanical equipment. The argument does not persuade us. We feel that the concept of stevedore should embrace anyone who by his acts can create—or avoid the creation of—those special risks which justify holding a stevedore to a warranty of super-carefulness to a ship, whose own liability to injured workers approaches strict liability. International was engaged in operating unloading machinery—the leg—inside the hold of the ship; more importantly, in order to operate the machinery it was necessarily in partial control of the ship. These actions carried with it a concomitant duty to exercise that control so as to protect the ship and those who must be exposed to the hazards of the work." *Id.* at 1016.

It might be argued that Northeast by sending its hoses on board was unloading the ship's oil and was thus in the position of a stevedore. But unlike the grain elevator company in *Hartnett,* Northeast did not supervise the unloading operation from aboard the vessel. Once the hose was on board the entire unloading operation was in the control of Maritime and was conducted by its employees, including the injured seaman Kennedy. We cannot say that the nature of the unloading operation shows that the parties intended that Northeast should bear ultimate responsibility for the safety of those conducting the unloading

operation or that Northeast was in a better position than Maritime to prevent accidents during that operation. We find no implied contract of indemnity.

IV. *Contribution*

■ Though Maritime has no right of indemnity against Northeast, it is entitled to contribution. Contribution between joint tortfeasors in a maritime action for personal injuries is proper where, as here, neither tortfeasor's liability is limited by statute. *See Cooper Stevedoring Co. v. Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974).

■ There is no merit in Northeast's argument that the jury verdict in Kennedy's action against Maritime necessitated a finding that Maritime was solely responsible for Kennedy's injuries. The only thing that follows perforce from the jury's finding Jones Act negligence is that Maritime negligently played a part, even if slight, in causing Kennedy's injuries. Nor does the jury's finding that the ship was not unseaworthy in a manner that was a proximate cause of Kennedy's injuries preclude the conclusion that Northeast was negligent in supplying a connecting hose that had not been emptied of oil and that that negligence was a joint cause of Kennedy's injuries.

■ Contribution between joint tortfeasors in admiralty is in proportion to their relative fault. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). We therefore remand to the district court for apportionment of damages. The court may make such apportionment on the record as presently constituted or may supplement the record as it deems necessary.

*Reversed and remanded for further proceeding consistent with this opinion.*