Francisco JOIA, Plaintiff, Appellee,

v.

JO-JA SERVICE CORP.,
Defendant, Appellee.

Boat Niagara Falls, Inc.,
Defendant, Appellant.

No. 85-1753.

United States Court of Appeals,
First Circuit.

Argued Nov. 5, 1986.

Decided May 1, 1987.

Thomas E. Clinton with whom Clinton & Muzyka, P.C., Boston, Mass., was on brief, for defendant, appellant.

Thomas J. Hunt with whom Law Offices of Thomas J. Hunt, Boston, Mass., was on brief, for Francisco Joia.

\* Of the District of Puerto Rico, sitting by designation.

Richard B. Kydd with whom Michael F. Kuppens and Kneeland, Kydd & Handy, Boston, Mass., were on brief, for Jo-Ja Service Corp.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and PIERAS,\* District Judge.

PIERAS, District Judge.

This is a seamen's suit for personal injuries against the employer and a water boat who had a service contract with the employer. Plaintiff, Francisco Joia (hereinafter "Joia") brought two counts against his employer, Boat Niagara Falls, Inc. (hereinafter "Niagara"), the first under the Jones Act, 46 U.S.C. § 688, and the second under the general maritime theory of unseaworthiness. Joia brought one count of common law negligence, a state law pendent claim, against co-defendant Jo-Ja Service Corporation,[1] the owner of the water boat, (hereinafter "Jo-Ja"). Both co-defendants filed cross claims for contractual indemnity. The case was tried to a jury on plaintiff's counts, and it returned a verdict for plaintiff, finding Jo-Ja 65% negligent, Niagara 30% negligent, and plaintiff 5% negligent. The jury awarded plaintiff damages in the amount of $360,000.00, allocating $44,000.00 for past wages, $65,964.00 for lost future earnings, and $250,036.00 for pain and suffering. It also awarded prejudgment interest at the rate of 10%.

At the close of plaintiff's case, Niagara moved for a directed verdict, which was denied. Both codefendants filed motions for judgment notwithstanding the verdict, which were also denied. The district court heard Jo-Ja's motion for limitation of liability, and by memorandum and order of judgment the court limited Jo-Ja's liability to the stipulated value of its vessel, which was $50,000.00. It entered judgment for plaintiff in the amount of $342,000.00, $50,-000.00 against Jo-Ja, and $292,000.00 against Niagara. The court allowed prejudgment interest on the $44,000.00 past

1. The parties settled two counts relating to maintenance and cure, and a stipulation of dismissal as to these counts was filed on May 29, 1985.

lost wages from August 1, 1983, onward. The assigned errors we examine on appeal relate to the denials of the directed verdict and judgment n.o.v., the limitation of liability, joint and several liability, excessive damages, and the codefendant's cross claims.

## I. *Factual Background*

On August 1, 1983, Joia was the engineer aboard the F/V NIAGARA FALLS, an eighty-foot-long steel hull stern dragger owned by Niagara. On that date it was docked in New Bedford, Massachusetts, having just returned from a fishing trip. At approximately 5:00 a.m., the water boat CHIPPY, owned by Jo-Ja, pulled alongside the F/V NIAGARA FALLS to fill its fresh water tank pursuant to a contract. The operator of the CHIPPY, Michael Mahoney, had previously filled the fresh water tank on the F/V NIAGARA FALLS approximately six to twelve times with no difficulty finding the water receptacle. However, on this date the operator mistakenly pumped approximately 200 to 300 gallons of water into its hydraulic oil fill. The hydraulic oil tank thus was overfilled causing a mixture of hydraulic fluid and water to overflow inside the boat. This fluid mix spilled onto the floor of the engine room. After realizing his mistake, the operator turned off the water and proceeded to fill the correct tank. Joia's claim of unseaworthiness against his employer was primarily based upon the lack of proper markings to identify the separate water and hydraulic oil fills.

Mahoney called his supervisor, Clifford Davignon, at about 6:30 a.m. and informed him of the accident. Davignon told the operator that he would take care of it. He arrived at the vessel at about 6:45 a.m. to find it locked. He contacted his employer, Thomas Thomas, at about 7:00 a.m., who instructed Davignon to clean the mess.

Meanwhile, at 9:00 a.m., Joia arrived to start the engine of the F/V NIAGARA FALLS. Joia walked partway down the ladder to the engine room and stopped when he saw water and oil all over the engine room floor. He watched from the ladder for about 10 to 15 minutes to determine the cause of the mess and then left the vessel to speak to the owners. He first spoke to co-owner, Joe Beatriz, who was unaware of the problem. Joia told Beatriz that he needed a pump to pump the water out. Beatriz gave Joia no instructions. Joia then spoke with co-owner Tony Pimental, who told Joia to clean the engine room. Joia responded that he could not clean the engine room until he pumped out some of the water.

Joia, ordered by Joe Beatriz, purchased a pump at a supply store and returned to the vessel at 11:40 a.m. He stepped down the ladder and into the engine room with the pump, and saw that the water level on the floor had not changed. Joia knew from experience that the oil on the floor was hydraulic oil. As he walked through the oil and water on the deck, he slipped and fell. He sat on the deck for three or four minutes, got up and took his tools, and installed the pump. Shortly after his fall, a representative of Jo-Ja arrived on the vessel. Joia asked the representative what happened, who responded that he did not know. Joia then called his wife, who picked him up at the vessel and took him to a doctor. He suffered back injuries, and required the surgical removal of a hydrocele in his right testicle, as well as a laminectomy to remove a herniated disc.

## II. *Directed Verdict and Motion for Judgment N.O.V.*

Niagara contends that the district court erred in denying both Niagara's motion for directed verdict and the motion for judgment notwithstanding the verdict. Its ground of support was that Joia breached his duty to his employer, Niagara, to maintain and keep clean the engine room on the F/V NIAGARA FALLS. The standard of review of a refusal to grant a directed verdict and a refusal to grant a judgment n.o.v. is the same. *De Mars v. Equitable Life Assur. Soc. of U.S.*, 610 F.2d 55, 57 (1st Cir.1979). A verdict should be granted only where the evidence could lead reasonable men to but one conclusion, without evaluating the credibility of the witnesses

or considering the weight of the evidence. *Id.* at 57. The appeals court must view the evidence most favorable to the nonmoving party and give that party the benefit of all reasonable inferences. *Id.* Because the standard of review is the same, we consider both motions together. With these axioms in mind, we now consider the district court's rulings.

■ Niagara argues the evidence shows that Joia is barred from recovery because his injuries resulted from a breach of his contractual duty to his employer, that of maintaining and cleaning the engine room, *citing Peymann v. Perini Corp.*, 507 F.2d 1318 (1st Cir.1974), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975). In *Peymann*, the plaintiff was an engineer on the defendant shipowner's tug boat. While conducting an engine overhaul, plaintiff attempted to hook a chain fall overhead. In order to reach the hook, plaintiff was required to stand upon something to increase his height. He looked but could not find a ladder. Instead, he perched "like a bird" on an iron pipe rail, of which he knew oil constantly dripped on. He fell from his perch and was injured. The trial court directed a verdict for the defendant. The appeals court affirmed, stating that the jury could have found that it was plaintiff's primary duty to maintain the engine room in a seaworthy condition, and that stepping on the rail without wiping off the oil which was placed there by him, was his sole responsibility. *Peymann*, 507 F.2d at 1323. *Peymann* is distinguishable from the case at bar. In *Peymann*, the plaintiff was responsible for creating the condition which caused his injuries, whereas here, a third party over whom Joia had no control created the unseaworthy condition on the engine room deck of F/V NIAGARA FALLS. Joia testified that the maintenance of the engine room was his responsibility. Co-owner Pimental directed him to clean the mess, saying: "If you said this is a big old mess, you go clean it up." Joia responded that he needed to pump out some of the water in order to lower the oil level, otherwise, additional water would cause the oil to rise over the deck again. He then proceeded to install the pump in the engine room, where he fell and suffered his injuries.

■ Furthermore, had his employer not given him directions, this might be a different case. Joia proceeded only under the general directions of his employer, where in *Peymann*, the plaintiff proceeded under his own directions. Indeed, under these circumstances, it would have seemed futile for Joia to have first attempted to clean the deck and then to pump the water, and foolish for his employer to have so directed. We cannot say that under *Peymann*, as a matter of law, Joia breached his duty to maintain a clean engine room. Joia was directed to clean this mess, understood his responsibility to maintain the engine room, and proceeded to remedy the problem in a manner he saw fit. This evidence could not lead reasonable men to one conclusion. It was for the jury to decide whether Joia proceeded in a reasonable manner, and it did decide, finding Joia 5% contributorily negligent.[2] We find that the district court properly denied Niagara's motions for directed verdict and judgment on Joia's breach of duty to his employer.

### III. *Charge to the Jury*

■ Niagara next argues that the district court committed prejudicial error in refusing to give its requested jury instructions regarding Joia's duty to his employer.

---

**2.** This case is somewhat similar to *Caddy v. Texaco, Inc.*, 363 Mass. 36, 292 N.E.2d 348 (1973). In *Caddy, supra,* a seamen was instructed to clean up oil and do some other work, but was not told in what order to proceed. The court held that his performing the other work first would only make him contributorily negligent, and not bar him from recovery. In *Peymann*, this court suggested that if the *Caddy* seaman had been instructed to clean the oil first, but instead performed the other work first,

he might not recover from his injuries. 507 F.2d at 1323 n. 2. Here Joia had to do two things, pump the water and clean the deck, though he was not instructed in what order. Joia did not disobey employer's orders, but proceeded to clean by pumping water first. While it may have been advisable, for instance, to place a plank over the deck, rather than wade through the oil and water, his manner of walking could only make him contributorily negligent.

The requested instructions dealt with the rule of *Peymann,* that is, if the jury found that the sole cause of Joia's injuries was his breach of duty to his employer, he is barred from recovery. That argument need not detain us long, for we have previously determined that the rule of *Peymann* is not applicable here.

While all parties are entitled to an adequate jury instruction upon the controlling issues, the court need not employ the precise language urged by any party. *Computer Identics Corp. v. Southern Pacific Co.,* 756 F.2d 200, 203–04 (1st Cir.1985). Moreover, if the district court's instruction properly apprises the jury of the applicable law, the failure to give the exact instruction requested does not prejudice the objecting party. *McKinnon v. Skil Corp.,* 638 F.2d 270, 274 (1st Cir.1981).

Our review of the jury instructions given regarding the duty issue shows that the district court adequately covered the applicable rules of law. In charging the jury, the district court instructed that the defendants were entitled to "rely upon him (Joia) to exercise reasonable care, knowledge and skill as an experienced person or as an experienced engineer." Moreover, the district court instructed more than once that the jury was to consider whether Joia's injuries were caused, in whole or in part, by his own negligence, and that the jury was to assign a percentage of any negligence committed by Joia and the defendants. The jury was instructed that it could assign a percentage of fault of 1 to 100 to either of the parties and that the total percentages must equal 100. Further, the jury was provided special verdict forms, which contained the names of the parties and a blank space after each for the assignment of percentages of negligence. Had the jury assigned 100 percent negligence to Joia, as it was told it could, a fortiori, Joia would have been denied recovery.

## IV. *Limitation of Liability and Joint and Several Liability*

Both Niagara and Joia argue that the district court erred in limiting Jo-Ja's liability pursuant to 46 U.S.C. § 183. After the jury verdict, and upon motion of Jo-Ja, the court limited Jo-Ja's liability to the stipulated value of the vessel, CHIPPY, to be $50,000.00. The court then entered judgment against Niagara for $292,000.00 and against Jo-Ja for $50,000.00, for a total judgment of $342,000.00, stating that but for the limitation, judgment would be entered jointly and severally against both defendants for $342,000.00. The plaintiff was to bare the brunt of his 5% negligence, or, $18,000.00. Thus, while the jury assessed 30% fault on Niagara, that court adjudged the defendant approximately 81% liable; on the other hand, Jo-Ja, which was adjudged to have incurred 65% negligence, must pay a maximum of only 19% of the judgment.

But for the limitation of liability, the parties would be jointly and severally liable in the amount of $342,000.00 on the three counts. The issue of whether the district court should or should not have limited Jo-Ja's liability presents a second, more compelling issue. That is, whether the dollar value of the judgment against Niagara should exceed its proportionate share of fault. Niagara argues this court should adopt the proportionate fault rule, and abolish joint and several liability in this context. Because Niagara's ultimate liability depends upon our resolution of the limitation of liability issue, we will first resolve the issue of limitation of liability.

The Limitation of Liability Act of 1851, 46 U.S.C. § 183(a), provides that in the event of an accident "done, occasioned, or incurred, without the privity or knowledge" of the vessel owner, the liability of the owner shall not exceed the value of the vessel. To determine the entitlement to limitation, the court must find what acts of negligence caused the accident. Second, the court must determine whether the vessel owner had knowledge or privity of those acts, in order to grant or deny limitation. *Farrell Lines, Inc. v. Jones,* 530 F.2d 7, 10 (5th Cir.1976), *reh'g denied,* 532 F.2d 1375 (5th Cir.1976). In the context of the corporate shipowner, as we have here, the privity and knowledge scrutiny focuses not

only on what the corporate owner knows, but also on what the corporate owner should have known. *Tittle v. Aldacosta,* 544 F.2d 752 (5th Cir.1977), *reh'g denied,* 546 F.2d 906 (5th Cir.1977); Gilmore and Black, *The Law of Admiralty* 886 (2d ed. 1975).

■ The district court found that Thomas, the owner of the water boat CHIPPY, was unaware of the operator's negligence in pumping the water into the hydraulic oil tank, and that Thomas was not on board the CHIPPY when the pumping occurred. That analysis is not sufficient to determine the issue, for

> An owner cannot close its eyes to what prudent inspection would reveal. An owner must avail itself of whatever means of knowledge are reasonably necessary to prevent conditions likely to cause losses. "If lack of actual knowledge were enough, imbecility, real or assumed, on the part of owners would be at a premium."

*Waterman S.S. Co. v. Gay Cottons,* 414 F.2d 724, 732 (9th Cir.1969), *quoting The Argent,* 1940 A.M.C. 508, 509 (S.D.N.Y. 1915).

Rather, the court must determine whether the shipowner had knowledge of the "acts of negligence or conditions of unseaworthiness." *Farrell,* 530 F.2d at 10. Undoubtedly, Thomas, as well as high managerial personnel, Clifford Davignon, the managing agent of the waterboat, knew of the pumping accident well before Joia suffered his injuries. Mahoney called Davignon and told him of the accident. Davignon contacted Thomas at approximately 7:00 a.m. and told him of the accident. Thomas informed Davignon to clean up the mess the "best way he could." Davignon posted no warning signs, failed to inform Joia or others of the accident, and returned to the engine deck some three hours later, after Joia had injured himself.

This is not a case where the vessel is at sea and the owner is unaware of emergencies, thus having to rely on his master. Instead, the vessel was docked, and the owner, as well as management, was within calling distance for any eventuality. It was Thomas who gave the directions to make the vessel seaworthy. Merely because Thomas did not watch the pumping accident, does not prevent him from having privity or knowledge of the circumstances which made the vessel unseaworthy. As the above facts clearly show, Thomas was aware of the accident very shortly after it occurred. Because of this lack of due diligence, the dangerous condition remained to the peril of others, including Joia.

> [W]here the circumstances are such that the owners or managing agents have a duty to act to see that the vessel is made seaworthy, a neglect or failure to take such action will require denial of limitation. Mere instructions to subordinate employees will not suffice to give the owner the benefit of the limitation act.

*States S.S. Co. v. United States,* 259 F.2d 458, 472 (9th Cir.1957), *cert. denied,* 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305 (1959). The Supreme Court discussed the privity or knowledge of a boat owner in an analogous situation in *Spencer Kellogg and Sons, Inc. v. Hicks,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932). Spencer Kellogg operated a factory on the New Jersey side of the Hudson River. It owned a launch which it used to ferry employees to and from New York City across the Hudson. The launch was not seaworthy when ice was in the river, and so the owner had instructed the manager of the factory, Stover, to not allow the launch to be used when ice was in the river. Stover so instructed the launch operator. Despite this instruction, on a day when there was ice in the river the launch was used, which resulted in an accident wherein lives were lost. The owner of the launch, Spencer Kellogg, sought to limit its liability, claiming it had no knowledge or privity with the negligent acts of the launch operator. The Supreme Court rejected this argument and found that the launch owner could properly be charged with knowledge or privity. The Court observed:

> The argument is that as the boat was seaworthy when there was no ice and instructions had been given to a competent master not to run her through ice,

the owner did its full duty and cannot be held responsible as having privity or knowledge of a violation by the master of these explicit instructions. Cases such as *La Brougogne*, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973, which involved the master's failure to obey rules and instructions when on the high seas and disaster attributable to such fault, are cited. But there is a vast difference between the cases relied on and the instant one. The launch was used for ferriage over a distance of about a mile and a third. She was known to be unseaworthy and unfit if there was ice in the river. There is no analogy between such a situation and that presented in the cited cases where the emergency must be met by the master alone. In these there is no opportunity of consultation or cooperation or of bringing the proposed action of the master to the owner's knowledge. The latter must rely upon the master's obeying rules and using reasonable judgment. The conditions on the morning in question could have been ascertained by Stover, if he had used reasonable diligence, and we think the evidence is adequate to support the finding that the negligence which caused the disaster was with his, and therefore with the owner's privity or knowledge.

*Spencer Kellogg*, 285 U.S. 511–12, 52 S.Ct. at 453. *Cf. Napoli v. [Transpacific Carriers Corp. and Universal Cargo Carriers, Inc.] Hellenic Lines, Ltd.*, 536 F.2d 505 (2d Cir.1976). Under the circumstances of this case, Jo-Ja is held to have privity and knowledge as a matter of law and is therefore not entitled to limit its liability.

As noted above, Niagara contends that the judgment entered against it should not exceed the proportionate degree of fault assessed by the jury. The jury did not assess three separate proportionate values of fault on each count. Rather, it placed one set of fault values against the parties for all three counts.

Niagara argues that liability should be entered not jointly and severally, but on the basis of responsibility. We understand its concern. Had we ruled that Jo-Ja was entitled to limit its liability, it would have

faced a judgment of $292,000.00, an amount substantially greater than its proportionate share of liability assessed by the jury, 30%, or $108,000.00. He argues, therefore, that this court should abolish or limit joint and several liability. His argument, however, must fail because the two bodies of law governing this case, maritime law and state common law of negligence, both provide that the defendants in this litigation are jointly and severally liable for the plaintiff's losses.

### a. Massachusetts Common Law

Under joint and several liability, the plaintiff is entitled to collect only the amount of the judgment, although he may recover any part or all of the judgment from one or more of the tortfeasors. The effect of joint and several liability is that each defendant is liable for the entire amount of damages to the plaintiff. Generally, the joint tortfeasor who pays more than his pro rata share of the judgment has a right of contribution over against the other joint tortfeasors for the excess.

Under Massachusetts law, joint tortfeasors are jointly and severally liable for a plaintiff's damages. *Feneff v. Boston & Maine R.R.*, 196 Mass. 575, 82 N.E. 705 (1907). "If two or more wrongdoers negligently contribute to the personal injury of another by their several acts, which operate concurrently so that in effect the damages suffered are rendered inseparable, they are jointly and severally liable." *Feneff*, 196 Mass. at 581, 82 N.E. at 707. When two or more defendants are held jointly and severally liable, the amount of the judgment is the same against all joint tortfeasors. *Delfino v. Torosian*, 354 Mass. 395, 237 N.E.2d 694 (1968). Under Massachusetts statutory law, a joint tortfeasor who pays more than his pro rata share of the judgment has an action for contribution against the other joint tortfeasors. Mass. Gen. L. ch. 231B. However, proportionate share of liability is determined not upon the relative degrees of fault, but by the number of joint tortfeasors involved. *MacLachlan v. Brother-*

*hood Oil Corp.,* 10 Mass.App. 811, 404 N.E.2d 1272 (1980).

### b. The Law Under the Jones Act and General Maritime Law

Joia argues that under the Jones Act and the general maritime law, joint tortfeasors are jointly and severally liable for a seamen's personal injuries, regardless of the defendants' degrees of fault. *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979); *Cooper Stevedoring Co. Inc. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). Niagara, on the other hand, contends that admiralty law has long recognized a proportionate fault rule, *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246 (5th Cir. 1979), or that, in the alternative, this court should recognize a proportionate fault rule in maritime cases involving personal injuries to seamen. We examine these contentions in light of the existing law.

In *Reliable Transfer,* the Supreme Court overruled the mutual fault rule established in *The Schooner Catharine v. Dickinson,* 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1855), and substituted a rule requiring that liability for damages be allocated when possible in proportion to the relative fault of each party. The mutual fault or equal contribution rule, which was the law in admiralty collision cases for over a century prior, required that property damage be equally divided whenever two or more parties were at fault, regardless of the relative degrees of fault.

In abolishing the rule, the Court noted that every major maritime nation had since discarded it and replaced it with the rule of comparative fault. *Reliable Transfer,* 421 U.S. at 397–98, 95 S.Ct. at 1708–09. The divided damages rule rested on the assumption that it provided "rough justice," because a determination of fault was difficult to measure. The Court stated that the rule was no longer viable in those instances where a determination of fault could be made in a particular collision, but that

there are occasions when degrees of fault cannot be calculated. A comparative negligence rule, moreover, would induce vessel owners to be more careful and deter them from harmful conduct that would result in greater liability. The Court's holding was clear:

> We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

*Reliable Transfer,* 421 U.S. at 411, 95 S.Ct. at 1715–16. The Court's holding was limited to collision cases involving property damage. Furthermore, there was no indication that the comparative fault rule should apply to a situation other than a maritime collision or stranding.

In *Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246 (5th Cir.1979), the Fifth Circuit extended the proportionate fault rule of *Reliable Transfer* to a noncollision personal injury case involving a seaman, stating that "[t]he reasoning of *Reliable Transfer* loses none of its cogeny in the context of a non-collision personal injury case." 592 F.2d at 1249. In *Leger,* an injured seaman brought suit against the defendants, under the Jones Act and under general maritime law. After two trials, the jury assigned comparative fault percentages against the parties, and awarded the seaman damages for his personal injuries. The award of damages came after the plaintiff settled with two of the three defendants. In fact, the two defendants settled for damages higher than their proportionate fault as assessed by the jury. As it then existed, if the nonsettling defendant paid damages proportionate to his fault, the plaintiff would recover an amount higher than the jury award. He therefore sought on appeal to reduce his damages to an amount lower than his comparative fault. He was seeking in effect, a dollar-for-dollar credit of the amounts the

plaintiff received in settlement. The Fifth Circuit rejected this argument, and held that the nonsettling defendant must pay his portion of the total damages of the jury award proportionate to his percentage of negligence. *Leger*, 592 F.2d at 1248–50. In so holding, the court based its decision on *Reliable Transfer* and *Cooper Stevedoring Co. v. Kopke*, 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), which allowed contribution in noncollision maritime cases, but left open the issue of division of damages. Furthermore, the *Leger* court saw this approach as encouraging settlements. Neither did the seaman enjoy a double recovery. Instead, it considered the plaintiff to have received a favorable settlement. We decline to take this approach for the following reasons.

We believe that *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), thought not controlling, states the admiralty rule applicable here. The plaintiff, a longshoreman, while employed by a stevedore, was injured while working on a vessel. He recovered statutory benefits from his employer under the Longshoreman's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* ("Act"). He later brought a direct action in negligence against the shipowner pursuant to § 905(b) of the Act. The jury found the shipowner 20% negligent, the stevedore-employer 70% negligent, and the plaintiff 10% negligent. Upon entering judgment, in accordance with maritime law, the district court ruled that the shipowner was liable for all the damages not due to the plaintiff's own negligence. In other words, though the shipowner was 20% negligent, it was liable for the employer's negligence for a total of 90% of Edmond's damages. The Fourth Circuit reversed, holding that 1972 amendments to the Act required the imposition of a proportionate fault rule whereby the shipowner was liable only for the share of damages assignable to its fault. The Supreme Court reversed the appeals court, holding that the 1972 amendments did not

alter the traditional maritime rule that, in a longshoreman's suit against a shipowner, while the award may be reduced by the plaintiff's negligence, the shipowner is responsible to the longshoreman for the remainder of the award, even if the negligence of the stevedores contributed to the injury. *Edmonds*, 443 U.S. at 272, 99 S.Ct. at 2762. The Court stated that Congress intended the 1972 amendments to eliminate both the shipowner's warranty of seaworthiness to the longshoreman and the stevedore's warranty of workmanlike service to the shipowner. *Edmonds*, 443 U.S. at 263, 99 S.Ct. at 2757–58. In dealing with the mixture of a statutory and judge-made loss allocating mechanism, the Court stated that this maritime rule applicable to a longshoreman's tort action is consonant with the common law rule.

> This ... rule is in accord with the common law, which allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident.

443 U.S. at 261, 99 S.Ct. at 2756–57. Manifestly, while the narrow holding of *Edmonds* does not govern a seaman's action, the rule applied there is the same as the rule applicable here.[3]

The Court recognized the inequitable burden the shipowner must shoulder, but held a stronger distaste for the unfairness a proportionate fault system would create against the longshoreman in light of the remedial purpose of the Act. 443 U.S. at 271, 99 S.Ct. at 2762. The loss allocating mechanism employed in *Edmonds* and the 1972 amendments are intended to compensate an injured longshoreman as fully as possible for the damages suffered.

We agree with the decision in *Ebanks v. Great Lakes Dredge & Dock Co.*, 688 F.2d 716 (11th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983), which held that in a maritime negligence

---

**3.** The Court cited the Restatement (Second) of Torts § 886 that "under traditional tort law, a plaintiff obtaining a judgment against more

than one concurrent tortfeasor may satisfy it against any one of them." *Id.*, 443 U.S. at 261, n. 8, 99 S.Ct. at 2756 n. 8.

action, it was error for the trial court to submit to the jury special interrogatories to determine the comparative degrees of fault between a defendant and a non-party. *Ebanks*, 688 F.2d at 722. The court relied on the *Edmonds* decision in holding that since the plaintiff may receive against either of several joint tortfeasors, the comparative degrees of fault is irrelevant. *Id.* Furthermore, a paying defendant has a right of contribution against a non-paying entity that may be decided in a different proceeding. *Id.*

The joint and several loss allocating mechanism which serves to provide an injured seaman his full judgment is consonant with the policy behind the Jones Act, to provide protection to seamen who are victims of negligence. *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949); *see also Bennet v. Perini Corp.*, 510 F.2d 114, 117 (1st Cir.1975) (Jones Act is to be construed remedially). The policy underlying the remedial nature of the Jones Act and the general maritime law necessitates our adherence to the joint and several rule. The rationale behind *Reliable Transfer*, which involved property damages, and a seaman's action, which involves personal injury, are not the same. The comparative fault rule of *Reliable Transfer* is designed to achieve a fair assessment of damages against each party according to their degrees fault and to deter harmful conduct of vessels. That rationale loses its strength in a seaman's tort action. If comparative fault were the rule, an injured seaman might have to bear damages higher than his degree of fault, for example in a case where a tortfeasor is insolvent and/or he or another tortfeasor has limited his liability according to the limitation act. Assuming in this case that Jo-Ja were entitled to limited liability, it would be liable for $50,000.00 in damages, and Niagara would be liable for $100,000.00 in damages. On a $360,000.00 judgment, Joia would bear $202,000.00 in damages, or 51% of the jury award, where he was only 5% at fault.

While the result we reach today may seem inequitable to a defendant, including Niagara, ultimately, in a contribution proceeding, it will be liable according to its degree of fault. Contribution between joint tortfeasors in admiralty is according to comparative fault. *Maritime Overseas Corp. v. Northeast Petroleum Indus.*, 706 F.2d 349, 355 (1st Cir.1983). Therefore, in this case if Niagara were to pay a disproportionate share of the judgment, it could seek contribution against Jo-Ja, and no inequities would result to either party. Admittedly, assuming again that Jo-Ja successfully limited liability, under the joint and several rule, Niagara would bear a larger, disproportionate share of the damages. But the Supreme Court made clear in *Edmonds* that the seamen should not suffer this inequity.

> Under the Court of Appeal's proportionate fault rule, however, there will be many circumstances when the longshoreman will not be able to recover in any way the full amount of his damages determined in his suit against the vessel. If, for example his damages are at least twice the benefits paid or payable under the Act and the ship is less than 50% at fault, the total of his statutory benefits plus the reduced recovery from the ship will not equal his total damages.

443 U.S. at 270, 99 S.Ct. at 2761. Moreover, the Court stated that in the Longshoremen's and Labor Worker's Compensation Act, Congress did not intend to place the burden of the inequity on the Longshoreman, "whom the Act seeks to protect." *Id.* at 270, 99 S.Ct. at 2761. Likewise, we do not find that Congress in enacting the Jones Act intended to place this similar burden on an injured seaman.

Niagara argues that this court should, in any event, follow the trend towards the adoption of comparative negligence. While we decline this invitation, the comparative negligence system has its merits in a case where one tortfeasor incurs minimal negligence, and the other tortfeasors are insolvent, enjoy limited liability, or are otherwise protected by operation of law, or in instances where the plaintiff incurs substantial contributory negligence. However, the decision whether to continue this trend is more properly before a legislature.

■ We hold that defendants Niagara and Jo-Ja are jointly and severally liable to plaintiff in the amount of $342,000.00 and that plaintiff bears the loss of $18,000.00, representing 5% negligence assigned by the jury.

### V. Jury Award for Damages for Pain and Suffering

Niagara contends that the jury award of $250,036.00 for damages for pain and suffering is unsupported by the evidence and is excessive, and the district court improperly denied its motion for a remittitur or a new trial on damages. On appellate review, a jury's award will be set aside only when it is so excessive "that the district court's refusal to order a new trial constitutes a manifest abuse of discretion." *Rivera v. Rederi A/B Nordstjernan*, 456 F.2d 970, 975 (1st Cir.1972), *cert. denied*, 409 U.S. 876, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972). The jury's verdict must stand unless it is "grossly excessive" as "shocking to the conscience." *LaForest v. Autoridad de las Fuentes Fluviales de Puerto Rico*, 536 F.2d 443, 447 (1st Cir.1976). The reviewing court is constrained to view the evidence in the light most favorable to the plaintiff. *Betancourt v. J.C. Penney Co. Inc.*, 554 F.2d 1206, 1207 (1st Cir.1977). We now turn to the evidence in the record.

■ In the August 1, 1983 fall, Joia injured both his back and his right testicle; prior to the injury he had problems with an enlarged testicle and was treated by a chiropractor for back problems although the extent of these prior conditions was not clear. While the pain in his testicle disappeared within minutes, after six days his testicle began to swell, and he consulted a urologist. After finding blood in his bladder, the urologist performed a cystourethrascopy on August 21, 1983. Joia testified that he was nervous about the scope being introduced into his penis, and he suffered a burning sensation after the operation. A different doctor operated on his groin in September of 1983. Joia testified that he was nervous about the operation, and that he was worried about the effects of the operation. In all, two operations were performed on his testicle, both resulting in pain and anguish. It is entirely understandable that a young, married man may have considerable anxiety and mental distress over the possible consequences of surgery on his reproductive organs.

Moreover, Joia suffered great pain in his back immediately after the accident, and his wife had to help him off the vessel. He sought treatment from a chiropractor on the day of the accident, who treated him for a period of one month; during the time he experienced severe pain. He consulted another chiropractor, during which time he was in greater pain than before. He consulted an orthopedist, who conducted an EMG. Another doctor conducted a myelogram, which required a one-week hospital stay, and during that stay he was placed in traction. Between July 30, 1984 and August 8, 1984, he was hospitalized for a laminectomy. This treating doctor, Dr. Ciminello, testified to the pain Joia experienced during this treatment.

In January 1985, Joia underwent a second myelogram for incontinence associated with his back injury; he felt ashamed for having wet his bed. He underwent a second cystoscopic examination. Joia also testified that since January, 1985, he has felt discomfort in his back and that his right foot is constantly numb. Dr. Ciminello confirmed that scar tissue remaining from the laminectomy might account for the discomfort in his back.

In substance, there was ample testimony that Joia experienced bouts of pain and humiliation during the year and one-half since the accident. Furthermore, there was evidence that Joia can no longer participate in family activities, including athletics and dancing.

Under our standard of review, we cannot say that, on the evidence and testimony presented, the jury award for pain and suffering was "grossly excessive," "shocking to the conscience," nor can we say that the court's refusal to order a new trial was a "manifest abuse of discretion." Concededly, while the award is very high, the total net award was reduced by the $18,-

000.00 attributed to the 5% negligence of Joia.

### VI. *Crossclaims*

Niagara's final contention is that the district court committed reversible error in failing to instruct the jury regarding its crossclaims against Jo-Ja for tort and contract indemnity. Under a theory of tort indemnity, between joint tortfeasors the whole loss may be shifted to the more guilty of the tortfeasors. *Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Authority*, 693 F.2d 1, 3 (1st Cir.1982). A contractual right to indemnity may arise if there are "unique special factors demonstrating that the would-be indemnitor bear the ultimate responsibility for the plaintiff's safety ... or where there is a generally recognized special relationship between the parties." *Araujo*, 693 F.2d at 2–3 (citations omitted).

▮ The record shows that Niagara failed to make a timely objection to the court's failure to give the instructions. Rule 51 states in pertinent part:

No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.

Fed.R.Civ.P. 51. This court has previously stated the rationale behind the rule:

The object of the rule is to afford the trial judge an opportunity upon second thought, and before it is too late, to correct any inadvertent or erroneous failure to charge. The rule also serves to lessen the potential burden of appellate courts by diminishing the number of rulings at the trial which they may be called upon the review.

*Marshall v. Nugent*, 222 F.2d 604, 615 (1st Cir.1955).

The record below reveals that after the second day of trial, the trial court stated to counsel that "I think everything has to go to the jury, which includes your two crossclaims." In response, Niagara submitted four questions regarding tort and contract indemnity in the verdict forms. During jury instructions, the trial court explained that Niagara had its claims against Jo-Ja, but did not specifically instruct the jury regarding the crossclaims for tort and contract indemnity. After the trial court finished reading the special verdict questions, it stated in open court: "Now, let me ask counsel, before I excuse the alternates, if they have anything to add?" Thereafter, at the bench and out of the presence of the jury, counsel for Niagara made one objection regarding the court's refusal to read its proposed instructions 9 through 16, which dealt with the *Peymann* issue. Niagara made no objection regarding the omission of the crossclaims from the special verdict forms. The jury then retired to deliberate.

Niagara objected to this omission three months after the jury verdict, at the limitation of liability hearing on August 7, 1985. Manifestly, Niagara's objection was not timely under Rule 51. These are precisely the circumstances that Rule 51 addresses. *Marshall v. Nugent, supra.* The trial court gave counsel ample opportunity to object to omissions in the special verdict form, and counsel for Niagara made none regarding this issue. Moreover, it may not rely on statements by the trial court prior to its conclusion of jury instructions as an excuse for its neglect. *See, e.g., DeHues v. Western Electric Co.*, 710 F.2d 1344 (8th Cir.1983).

▮ As to tort indemnity, along with its procedural problem under Rule 51, Niagara's active negligence precluded it from recovering against Jo-Ja under that theory beyond its percentage of negligence as found by the jury. "Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate." *Arauso*, 693 F.2d at 3. Niagara could not have recovered under a theory of tort indemnity.

Affirmed in part, reversed in part.