**SOMARELF, Elf Union and Fairfield Maxwell Services, Ltd., Plaintiff,**

v.

**The AMERICAN BUREAU OF SHIPPING, Defendant.**

**Civ. A. No. 86–4615.**

United States District Court, D. New Jersey.

Dec. 29, 1988.

As Amended Feb. 7, 1989.

---

William France, Healy & Baillie, New York City, for plaintiff.

Sarah M. Barton, Adams & Barton, Paramus, N.J., for defendant.

## OPINION

WOLIN, District Judge.

In this maritime action, defendant American Bureau of Shipping ("ABS") moves for summary judgment dismissing the indemnification claim of plaintiff Fairfield Maxwell Services, Ltd. ("Fairfield"). For the reasons set forth below, defendant's motion is denied.

## I.  BACKGROUND

Defendant ABS is engaged in the business of measuring vessels as well as certifying vessels for seaworthiness, as determined by ABS standards. As part of its business, ABS measures and certifies the gross and net tonnage measurements of vessels. These measurements can be tailored for specific purposes, such as for particular countries or for particular places such as the Suez Canal.

On November 20, 1980, ABS measured the vessel "Happy Sprite" and issued a certificate of measurement as well as a Suez Canal special tonnage certificate. On March 24, 1981, ABS issued a certificate of measurement and Suez Canal special tonnage certificate for the vessel "Jolly Sprite."

The owners of the "Happy Sprite" and "Jolly Sprite" are represented in this action by their designated agent, Fairfield. The "Happy Sprite" was built by Sasebo Heavy Industries Co., Ltd. of Japan ("Sasebo"), and was delivered to her owners in December, 1980. The "Jolly Sprite" was also built by Sasebo and delivered in March, 1981. Both vessels had already been chartered to Elf Union, a French corporation, by virtue of two time charters; the time charter for the Happy Sprite dated April 20, 1979 and that for the Jolly Sprite (renamed Vic Bilh) dated June 5, 1979. On January 1, 1980, Somarelf, also a French corporation, succeeded to the interests of Elf Union as time charterers of the vessels.

Somarelf sub-chartered the vessels on four occasions: The "Happy Sprite" was sub-chartered to Petrolexport of Bucharest under a voyage charter party dated December 23, 1980; and to Societe Francaise des

Petroles BP under voyage charters dated January 27, 1983 and March 1, 1983. The "Jolly Sprite" was subchartered to Sociedade Portugesa de Navios Tanques Lda. on April 2, 1981. On each occasion the vessels were sub-chartered, the vessels traveled through the Suez Canal. On twelve other occasions when the vessels passed through the Suez Canal, Somarelf was using the vessels for its own account.

Through an error, ABS miscalculated, ABS had underestimated the Suez Canal tonnage figures of both the "Happy Sprite" and "Jolly Sprite". The ABS originally calculated the Suez Canal tonnage of each vessel to be 43,453.44 tons. The Suez Canal tonnage figure should have been 57,-187.74 tons. On October 23, 1984 the Suez Canal Authority ("SCA") wrote to ABS asking for its explanation of an apparent discrepancy in the Suez Canal and British underdeck tonnages which ABS had determined when calculating the Suez Canal tonnage for the "Jolly Sprite" and later, after being renamed the "Vic Bilh", when calculating the British national tonnage. On November 5, 1984 ABS wrote to the SCA advising that because of an error in ABS's calculations the Suez Canal underdeck tonnage was incorrect and subsequently the gross and net Suez Canal tonnages previously calculated by ABS were also incorrect. ABS advised the SCA of the correct Suez Canal tonnages. Thereafter, the SCA revised upward its assessment of charges upon the vessels for use of the Suez Canal, including additional charges for previous passages of the vessels through the Canal. Somarelf claims it paid approximately $200,000.00 in additional Canal dues to the Suez Canal Authority. Somarelf also contends that because of ABS's miscalculation, Somarelf undercharged its sub-charterers on the Suez Canal differential, an element of the charter cost consisting of a lump sum charge plus a dollar charge multiplied by the vessel's Suez Canal net tonnage. As a result of this undercharging, Somarelf claims lost gross income from its four sub-charterers amounting to $166,185.00.

On September 5, 1986, Somarelf and Fairfield commenced this action in the Southern District of New York. The action was then transferred to the District of New Jersey. Somarelf claimed damages in the amount of $166,185 and Fairfield made a claim for indemnity from ABS. ABS subsequently moved for summary judgment, the motion currently before the Court. In its original supporting brief, ABS argued, in part, that Fairfield could not make a claim for indemnity since it had not yet paid any compensation to Somarelf. However, on August 4, 1988, Fairfield and Somarelf entered into a settlement agreement providing for payment to Somarelf of $200,000.00 in settlement of Somarelf's purported claims under the warranty of the time charter agreements between Somarelf and Fairfield (acting as agent for the owners of the "Happy Sprite" and "Jolly Sprite"). Somarelf apparently is now withdrawing from this action. Plaintiff's Memorandum in Opposition, p. 9. Thus, ABS's original argument as to the right of Fairfield to claim indemnity from ABS is now moot. However, ABS continues to press its argument for summary judgment on other grounds.

## II. DISCUSSION

The settlement payment from Fairfield to Somarelf, and Somarelf's withdrawal from this action, narrows the issue in this case to Fairfield's right to be indemnified by ABS in the amount of the $200,000.00 settlement Fairfield paid to Somarelf. Fairfield puts forward two main theories upon which its claim for indemnification can be grounded: contractual indemnity and tort-based indemnity. The Court will discuss each of these theories in turn.

### A. *Contractual Indemnity*

█ In the context of a maritime case, a contractual right to indemnification can be found in the express terms of the contract or can be implied if there are "unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility for the plaintiff's safety, or when there is a generally recognized special relationship between the parties." *Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Authori-*

*ty,* 693 F.2d 1, 2–3 (1st Cir.1982) (citations omitted). See also *Maritime Overseas Corp. v. Northeast Pet. Indus.,* 706 F.2d 349, 353 (1st Cir.1983); W. Prosser, *Law of Torts* § 51.

In the case at hand, plaintiff has pointed out no express provision in the contract between ABS and the vessel owners which might give rise to an express right of indemnification from ABS. Moreover, the broad exculpatory clause contained in the contract, while of dubious validity, does indicate that ABS did not intend to assume liability for lost revenue or additional Suez Canal dues in the event ABS's tonnage calculations were mistaken. See *In Re Oil Spill by the Amoco Cadiz Off the Coast of France on March 16, 1978,* 1986 A.M.C. 1945 (N.D.Ill.1986) [1986 WL 4705] (hereinafter *Amoco Cadiz* ).

The Court also finds that a contractual right of indemnification cannot be implied from the contractual relationship between ABS and the vessel owners. An implied contractual right of indemnity has been found in maritime cases in which a ship owner and a contracting party have a special relationship in which the other party is subject to an implied warranty of workmanlike service. The seminal case in this regard is *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). In *Ryan,* the Supreme Court found that the special relationship between a stevedoring company and a vessel owner implies that the stevedoring company warrants performance of its services in a workmanlike manner and will indemnify the vessel owner for any liability arising from a breach of that warranty of workmanlike service.

The rationale for implying such a warranty is based on the belief that a stevedoring company which takes control of the ship to unload it is more capable than the vessel owner of avoiding accidents while unloading the ship. See *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964); *Maritime Overseas Corp.,* 706 F.2d at 353.

The *Ryan* decision has been expanded upon by courts to allow for a finding of an implied warranty of workmanlike service and an implied right of indemnification in cases involving non-stevedoring service contracts with vessel owners. See, *e.g., Amoco Cadiz,* 699 F.2d 909, 915 (7th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 172 (1983) (negligent design of ship); *Tebbs v. Baker–Whiteley Towing Co.,* 407 F.2d 1055, 1058 (4th Cir.1969) (towing contract); *United N.Y. Sandy Hook Pilots Ass'n v. Rodermond Industries,* 394 F.2d 65, 71 (3rd Cir.1968) (*Ryan* principles found to be frequently applied to non-stevedore maritime contractors); *American Export Lines v. Norfolk Shipbuilding & Drydock Corp.,* 336 F.2d 525 (4th Cir.1964) (shipyard service contract).

However, in contrast to the instant action involving ABS, the above cases which expanded upon *Ryan* all in some way involved safety or the prevention of maritime accidents. *Fairmont Shipping Corp. v. Chevron International Oil Co., Inc.,* 511 F.2d 1252, 1257 (2d Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed. 2d 57 (1975) (application of *Ryan* indemnity has "rested … on elements of expertise, control, supervision and ability to prevent accidents."). It is clear that the ABS service contract with the owners of the "Happy Sprite" and "Jolly Sprite" did not in any way concern safety or prevention of accidents, nor did ABS's miscalculation of Suez Canal tonnage compromise the safety of the vessels. As such, the contractual relationship ABS had with the vessel owners cannot properly be subject to the dictates of *Ryan* and its progeny. Indeed, a court recently found that ABS, in its capacity as a certifier of a ship's seaworthiness, is not involved in the kind of special relationship with vessel owners that will give rise to an implied contractual right to indemnity under the principles of *Ryan. Amoco Cadiz,* 1986 A.M.C.1945 (N.D.Ill.1986).

Therefore, because of the absence of any express contractual provision whereby ABS undertook to indemnify the vessel owners, and the lack of any special relationship between ABS and the vessel owners which

might concern maritime safety, the Court finds Fairfield is not entitled to indemnification from ABS based on a theory of an implied contractual right of indemnity.

## B. *Tort-based Indemnity*

While the Court finds ABS is not subject to an implied contractual duty of indemnity, the Court nevertheless concludes that Fairfield may be entitled to a tort-based indemnity payment from ABS, depending on the determination of certain outstanding material issues of fact.

Tort-based indemnification is a means by which a loss can be shifted to the party who is the far more culpable in a case involving more than one tortfeasor. Tort-based indemnification,

> ... has usually been available only where the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault. 'Passive negligence' has been limited to instances in which the indemnitee was vicariously or technically liable. Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate.

*Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Authority,* 693 F.2d 1, 3 (1st Cir.1982) (citations omitted). See also *M & O Marine, Inc. v. Marquette Co.,* 730 F.2d 133 (3d Cir.1984); *Maritime Overseas Corp. v. Northeast Pet. Indus.,* 706 F.2d at 351; W. Prosser, *Law of Torts* at § 51.

In the case at hand, ABS contracted with the vessel owners to calculate the Suez Canal tonnage figures. ABS was solely responsible for the calculation and must bear full responsibility for the error in the figures. The Court therefore finds ABS was the party actively at fault while the vessel owners were merely technically liable for breach of their warranty with Somarelf that the "Happy Sprite" and "Jolly Sprite" were in full compliance with Suez Canal regulations.

The fact that ABS is responsible for the error does not, however, automatically subject ABS to tort-based indemnification. ABS's action towards the vessel owners and Somarelf must fall into some legally recognizable category of tort. Plaintiff points to Section 552 of the Restatement (Second) of Torts, Information Negligently Supplied for the Guidance of Others, as demonstrating that ABS's conduct did indeed fall within a recognized category of tortious behavior.[1]

ABS contends that the "General Maritime Law does not recognize a negligent misrepresentation cause of action in circumstances involving maritime services." Defendants' Reply Brief, p. 5. However, there is a conspicuous lack of support for this proposition. Moreover, the Court finds that there do exist at least two maritime cases in which courts have found that a claim for negligent misrepresentation can be made in the context of maritime law. *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.,* 826 F.2d 424, 428 (5th Cir.1987); *Royal Embassy v. Ioannis Martinos,* 1986 A.M.C. 769 (E.D.N.C.1984). *Coastal (Bermuda)* is particularly relevant. It involved

---

1. Section 552 provides:
   Information Negligently Supplied for the Guidance of Others
   (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
   (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

   (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
   (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
   (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.
   Restatement (Second) of Torts § 552 (1977).

a negligent misrepresentation claim against a cargo inspection company for faulty analysis of a cargo of oil. The cargo analysis in no way affected safety or prevention of accidents, and the claim was for financial loss only. Significantly, the Fifth Circuit, while finding no liability attached, did not question the proposition that a negligent misrepresentation cause of action exists in maritime law. This Court agrees with the Fifth Circuit, and can find no persuasive authority or maritime law principles suggesting that a negligent misrepresentation cause of action should not be recognized under maritime law. Therefore, if ABS did commit the tort of negligent misrepresentation, Fairfield could properly seek tort-based indemnification from ABS.

## C. Unresolved Issues of Fact

■ Although the Court finds that the tort of negligent misrepresentation does exist under maritime law, it remains in issue whether ABS actually committed the tort. In order to sustain a claim for negligent misrepresentation under Section 552 of the Restatement (Second) of Torts, a plaintiff must prove that: (1) the defendant, in the course of its profession, supplied false information for the plaintiff's guidance in a business transaction; (2) the defendant failed to exercise reasonable care in gathering the information; (3) the plaintiff relied on the false information in a transaction that the defendant knew the information would influence; and (4) the plaintiff thereby suffered pecuniary loss. *Coastal (Bermuda)*, 826 F.2d at 429.

■ Of the above elements, only the first and second appear to be factually settled matters. ABS did, in the course of its profession, supply mistaken Suez Canal tonnage figures for the vessel owners' and Somarelf's guidance in a business transaction; and ABS did fail to use reasonable care in gathering the mistaken information. However, it remains in dispute whether or in what degree the vessel owners and Somarelf relied upon the Suez Canal tonnage figures supplied by ABS. The timing of the transactions between the vessel owners

and Somarelf cast some doubt on the parties' reliance on the ABS calculations. Furthermore, it remains unclear if industry custom is such that the ABS figures were merely advisory and preliminary pending confirmation by the Suez Canal Authority.

As for the fourth element of negligent misrepresentation, pecuniary loss, the Court finds material issues of fact exist as to the extent of Somarelf's losses. The supporting papers of ABS point to the possibility that Somarelf's delayed payments to the SCA resulted in added interest income to Somarelf. There is also the question of how fluctuating exchange rates may have affected Somarelf's obligations to the SCA. Perhaps most important, it remains unclear why Somarelf did not seek to reform its subcharter agreements so as to reimburse Somarelf for the unexpected, additional Suez Canal tolls.

■ Uncertainty as to the extent of Somarelf's pecuniary losses also puts in question the reasonableness of Fairfield's $200,000.00 settlement agreement with Somarelf. Indemnity is not foreclosed by a potential indemnitee's settlement of a case, *M & O Marine*, 730 F.2d at 133, but an indemnitee must prove actual liability to the party paid as well as reasonableness of the settlement. *Id.; Whisenant v. Brewster-Bartle Offshore Co.*, 446 F.2d 394, 401 (5th Cir.1971).

The Court finds that the vessel owners did breach Article 51 of its charter agreements with Somarelf because of the incorrect Suez Canal tonnage figures, and thus were actually liable to Somarelf for breach of the owners' warranty that the chartered vessels complied with Suez Canal navigation and tonnage regulations. Affidavit of Gerard Peiniau, Exhibits A and B. However, the reasonableness of Fairfield's $200,000.00 settlement with Somarelf remains in question. As noted above, the extent of Somarelf's losses has not been conclusively proven by the supporting papers of this motion. Moreover, plaintiff has not adequately responded to defendants' accusation that the Fairfield–Somarelf settlement was, in reality, a "sweetheart deal" between parties who are close-

ly related in their business relations and ownership.

Therefore, while the Court finds that Fairfield has stated a viable claim for indemnity from ABS, mandating denial of ABS's motion for summary judgment, the Court concludes that remaining material issues of fact must be resolved before a final determination can be made as to Fairfield's indemnity claim against ABS.

### III. CONCLUSION

For the reasons set forth above, the summary judgment motion of ABS is denied. However, because of remaining material issues of fact, the Court declines plaintiff's invitation to grant summary judgment in its favor on plaintiff's claim for indemnification from ABS for plaintiff's $200,000.00 settlement with Somarelf.