**SOMARELF, Elf Union and Fairfield Maxwell Services, Ltd., Plaintiffs,**

v.

**The AMERICAN BUREAU OF SHIPPING, Defendant.**

**Civ. A. No. 86–4615.**

United States District Court,
D. New Jersey.

Sept. 5, 1989.

As Amended Sept. 29, 1989.

William France, Healy & Baillie, New York City, for plaintiffs.

Sarah M. Barton, Adams & Barton, Paramus, N.J., for defendant.

## OPINION

WOLIN, District Judge.

This is a maritime action originally brought by plaintiffs Somarelf and Fairfield Maxwell Services Ltd. ("Fairfield Maxwell"), for damages incurred because of mistakes in calculation by defendant American Bureau of Shipping ("ABS"), a classification society which classifies and surveys ships. After the action was commenced, Fairfield Maxwell paid $200,000 in settlement to Somarelf for all claims Somarelf had arising from the miscalculation and for breach of the charter warranties extended to Somarelf by vessel owners represented by Fairfield Maxwell as agent. Fairfield Maxwell then pursued an action for indemnification against ABS. ABS's motion for summary judgment was denied. *Somarelf v. American Bureau of Shipping*, 704 F.Supp. 59 (D.N.J.1988), and the Court pointed out certain unresolved issues of fact. *Id.* at 64. This matter was tried on May 9–12, 22–26, 1989 before this Court without a jury. The following constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### The Parties and Vessels Involved

1. Somarelf is a corporation formed and existing under the laws of the country of France. Somarelf is engaged in the business of operating and chartering ocean-going vessels for the carriage of crude oil and petroleum products. Somarelf's chartered vessels are employed in the carriage of crude oil and petroleum products for the account of Somarelf's parent corporation, Elf France, a subsidiary of Society National Elf Aquitaine ("SNEA"); for the account of other subsidiaries of SNEA and, on occasion, for its own account when fixing time chartered vessels in the spot market. SNEA is a French corporation, 51% of the shares of which are held by the French government.

2. Somarelf was, at all material times, the successor of Elf Union as of January 1, 1980 and the time charterer of two motor tank vessels, the HAPPY SPRITE and JOLLY SPRITE (renamed VIC BILH). Somarelf employed the vessels for the carriage of crude oil and petroleum products. During the material time, Somarelf voyage chartered (sub-chartered) the vessels on

four occasions. It was in regard to these sub-charters that Somarelf's claims arose.

3. Fairfield Maxwell is a corporation organized and existing under the laws of the United Kingdom. Fairfield Maxwell and several other corporations comprise the Fairfield Maxwell group of companies whose primary business is international shipping. Fairfield Maxwell is a ship management and operating affiliate of the Fairfield Maxwell Group.

4. Fairfield Maxwell was, at all material times, the managing agents for and operators of the motor tank vessels HAPPY SPRITE and JOLLY SPRITE, on behalf of the registered owners of those vessels. Fairfield Maxwell brings this action in its capacity as agents for the registered owners of the motor tank vessels HAPPY SPRITE and JOLLY SPRITE.

5. ABS is a not-for-profit ship classification society created by Special Act of the New York State Legislature in 1862. In addition to providing ocean-going vessel classification services, ABS, along with other recognized international classification societies, measures ocean-going vessels and certifies such vessel measurements, including gross and net tonnage measurements, on behalf of national governments and the Panama and Suez Canal Authorities. The Suez Canal Authority (the "SCA") authorizes ABS to issue Suez Canal Special Tonnage Certificates. Trial Transcript (hereinafter "Tr.") 1009.

6. The motor tank vessel HAPPY SPRITE was built by Sasebo Heavy Industries Co., Ltd. of Japan ("Sasebo") as hull 283 and was delivered to her registered owner Astre Tankers Limited of Liberia ("Astre"), a company of the Fairfield Maxwell Group, on or about December 22, 1980. Tr. 20–26. The contract for construction of hull 283 was entered into with Sasebo in July, 1979 by Comet Tankers, a company of the Fairfield Maxwell Group. On delivery, the HAPPY SPRITE was reregistered in the names of New Eastern Limited ("New Eastern") and Astre. New Eastern was a company owned by Taiyo Fisheries, a Japanese corporation, and was a 50% owner of the HAPPY SPRITE. Astre and New Eastern remained joint owners of the HAPPY SPRITE until April 1985, when the vessel was sold to Aquastar Navigation. The sale to Aquastar provided that Astre and New Eastern would take the vessel back on a 10–year charter. At all material times, from 1979 through 1985, the HAPPY SPRITE was at least 50% owned by companies of the Fairfield Maxwell Group.

7. The motor tank vessel JOLLY SPRITE was built by Sasebo as hull 285 and was delivered to her registered owner, Penmarine Ltd. ("Penmarine"), a Liberian corporation, on or about March 25, 1981. Tr. 33. The contract for construction of hull 283 was entered into with Sasebo in July, 1979 by New Caravel Ltd. ("New Caravel"), a company of the Fairfield Maxwell Group which acted on behalf of SNEA in entering into the construction contract. The vessel was transferred to Penmarine on her delivery. Penmarine was owned by Eton Trading which was, in turn, owned by SNEA. Tr. 22–23. Subsequently, Penmarine decided to transfer the JOLLY SPRITE from Liberian to British flag. As an accommodation to Penmarine and as part of that transfer, Lenox Holdings Limited was established by the Fairfield Maxwell Group to act as registered owner until the transfer to British flag occurred in February, 1982. In February, 1982, ownership of the JOLLY SPRITE was transferred to Lombard Facilities Ltd. and Lombard Discount Ltd., British financing institutions unrelated to either the Fairfield Maxwell Group or SNEA. The vessel's name was then changed from the JOLLY SPRITE to the VIC BILH. The VIC BILH remains in the ownership of Lombard Facilities Ltd. and Lombard Discount Ltd. The VIC BILH left British flag on March 26, 1986 and has changed countries of registry on several occasions. The VIC BILH is presently registered in Hong Kong. Since the transfer of the JOLLY SPRITE's ownership to Lombard in February, 1982, Fairfield Maxwell has continued to have the management and operational responsibilities for the vessel.

*The Suez Canal Special Tonnage Certificates for the Vessels*

8. Fairfield Maxwell selected ABS as the classification society for the HAPPY

SPRITE and JOLLY SPRITE. ABS was selected because it was regarded as more efficient and more reliable than other classification societies. Tr. 37–39. The construction contracts provided that the vessels would be designed and constructed under ABS's supervision and according to ABS's rules and standards and that the vessels would be delivered classed by ABS and with all necessary statutory certificates including Liberian National and Suez Canal Special Tonnage Certificates. Fairfield Maxwell Group representatives supervised construction of both vessels and Penmarine paid for these services in respect of hull 285. Tr. 36–38, 48; Exh. 216. ABS's services during the construction of the vessels, including preparation and issuance of the Suez Canal Special Tonnage Certificates, were for the benefit of the builders and owners of the vessels. During construction, ABS communicated with representatives of the Fairfield Maxwell Group. After deliveries of the vessels, ABS communicated with Fairfield Maxwell concerning the services ABS provided for the vessels. Tr. 159, 160–61, 987–88.

9. On or about October 6, 1980, Sasebo issued its "Tonnage Computation Under Register (Liberian) Tonnage Regulation" and its "Tonnage Computation Under Suez Canal Tonnage Regulation" for Sasebo hull 283, the HAPPY SPRITE. Those Tonnage Computations were attested to by ABS's surveyor at the port of Sasebo, Japan. The attestation consisted of a confirmation that the Tonnage Computations accurately reflected the physical dimensions of Sasebo hull 283. The Tonnage Computations were then forwarded to the Tonnage Section of the Hull Structures Department at ABS's headquarters then located in New York City. Vessel tonnages under Liberian and Suez Canal tonnage regulations, and under tonnage regulations of other nations or authorities, refer to measured or calculated volumes, not weights, of a vessel's hull and superstructure.

In this case, Sasebo prepared two tonnage computations for the HAPPY SPRITE: "Tonnage Computation Under Register (Liberian) Tonnage Regulation" (Exh. 6) and "Tonnage Computation Under Suez Canal Tonnage Regulation" (Exh. 7). The Liberian Tonnage computation contained a complete calculation of the underdeck tonnage. The "number tons below tonnage deck as measured" on Sasebo's computation was 60,320.67. Liberian tonnage regulations exempt underdeck water ballast spaces from the underdeck tonnage. Consequently, Sasebo's computation subtracted a total of 13,698.30 tons for the fore and afterpeak and numbers 2 and 4, port and starboard, ballast tanks. The "number tons below tonnage deck for registry" was therefore 46,622.37 tons. Sasebo's Suez Tonnage Computation contained no calculation of the underdeck tonnage. Rather, in the appropriate space on that computation, Sasebo had simply written: "As similar to Reg.[ister] underdeck tonnage 46,622.37." As Suez Canal tonnage regulations do not exempt underdeck ballast spaces, Sasebo's statement was incorrect. The Suez Canal underdeck tonnage should have been approximately 60,320.67 tons, as determined on the Liberian Tonnage Computation before deduction of the underdeck water ballast spaces. Tr. 529–33.

These computations were prepared by Sasebo as a courtesy and free of charge to ABS, Tr. 532, and to act as a time saving measure. The tonnage computations were a part of the effort necessary for ABS to prepare the Liberian national and Suez Canal Special Tonnage Certificates. Had they not been prepared by Sasebo, Mr. Boyle of ABS would have prepared them. The responsibility for determining what was necessary to issue the Suez Canal Special Tonnage Certificate was ABS's; its decision to rely on Sasebo's computation in undertaking its job made ABS ultimately responsible for Sasebo's error. Tr. 642–44. Had Mr. Boyle of ABS's tonnage section prepared the Tonnage Computations himself instead of utilizing Sasebo's Tonnage Computations, there would have been no error in the Suez Canal underdeck tonnage. Tr. 575–77. Instead, Mr. Boyle performed a detailed review and check of Sasebo's Tonnage Computations, correcting Sasebo's calculations when he found errors. His

review and check, utilizing vessel plans furnished to him, took seven to ten days. He then prepared the Liberian National Tonnage and the Suez Canal Special Tonnage Certificates for the HAPPY SPRITE. The Liberian National Tonnage Certificate took approximately one hour for Mr. Boyle to prepare. The Suez Canal Special Tonnage Certificate required two to three days. Tr. 523–30, 559–60, 567–78. Mr. Boyle failed to detect the error in the Suez Canal Tonnage computation that omitted the ballast tanks from the underdeck tonnage. Consequently, the Suez Canal net tonnage certified by him was 43,453.44 tons. Exhibit 1. It should have been 57,187.74 tons or 13,-734.30 tons more. Mr. Boyle conceded that the error in the Suez Canal Tonnages was not a matter of interpretation of the Suez Canal Tonnage regulations but was a plain mistake and "human error" on his part in calculating the tonnages. Tr. 529–30, 531–33, 539–41; Exh. 28. The Suez Canal Special Tonnage Certificate for the HAPPY SPRITE dated November 20, 1980 was signed by Mr. Edward Doherty, principal surveyor and head of ABS's Tonnage Section. Exhibit 1. Mr. Doherty did not review the tonnage computation, but only signed his name. According to Mr. Doherty, an error like the one in the HAPPY SPRITE's Suez Canal tonnages had never occurred before. Tr. 694, 698.

10. As a result of the error, ABS supplied the owners of the HAPPY SPRITE with incorrect information in the form of an incorrect Suez Canal Special Tonnage certificate. Exhibit 1.

11. ABS failed to exercise reasonable care in preparing the Suez Canal Special Tonnage certificate for the HAPPY SPRITE.

12. The JOLLY SPRITE was, in all respects, a sister vessel of the HAPPY SPRITE. Therefore, ABS relied upon the tonnage calculations and its certificates for the HAPPY SPRITE when issuing the Liberian National and Suez Canal Special Tonnage Certificates for the JOLLY SPRITE on March 24, 1981. However, ultimate responsibility for not preparing separate tonnage computations for the JOLLY SPRITE rested with Mr. Boyle. Tr. 643–44. Therefore, the net Suez Canal tonnage certified by ABS for the JOLLY SPRITE in the Suez Canal Special Tonnage Certificate for that vessel dated March 24, 1981 was also 13,734.30 tons less than it should have been. Tr. 608.

13. As a result, ABS supplied the owners of the JOLLY SPRITE with incorrect information in the form of an incorrect Suez Canal Special Tonnage Certificate. Exhibit 2.

14. Through its reliance on the HAPPY SPRITE calculations, which were in turn based on the mistaken Sasebo calculations, ABS failed to exercise reasonable care in preparing the Suez Canal special tonnage certificate for the JOLLY SPRITE.

15. Calculation of vessel tonnages, including Suez Canal tonnages, requires training and expertise beyond that possessed by a vessel owner or manager's employees. Vessel owners, as well as authorizing national governments and agencies themselves, rely upon experts in the field, like ABS, to calculate and certify vessel tonnages, including Suez Canal tonnages. Tr. 277–80, 1006–09.

16. ABS has an obligation to accurately satisfy requests for issuance of tonnage certificates. Such certificates are relied upon by governments and canal authorities, and are an indispensable part of the maritime industry. ABS knows the importance of their tonnage certificates to the maritime industry, and ABS officers and employees understand that many parties may properly rely on Suez Canal special tonnage certificates issued by ABS. Those Suez Canal certificates are not specifically addressed to any one party and there is no disclaimer of liability or accuracy on the certificates. The Court finds, therefore, that ABS understood that the Suez Canal special tonnage certificates for the HAPPY SPRITE and JOLLY SPRITE could be used for the benefit of other parties in the maritime industry with an obvious need to rely on such certificates; specifically, time charterers and voyage charterers, as well as owners. Tr. 551–52, 565–67, 604–07, 638–

42, 668–70, 682–83, 689–90, 981–88, 991–93, 1000–1011.

### The Time Charters for The HAPPY SPRITE and JOLLY SPRITE

17. The HAPPY SPRITE was built to be time chartered to Somarelf for use in lightering SNEA's very large crude carriers ("VLCCs"). The JOLLY SPRITE was built for the same purpose but for SNEA's account. Tr. 20–21. Both vessels were time chartered to Elf Union of Paris, Somarelf's predecessor in interest. The HAPPY SPRITE time charter between Astre, as the owner, and Elf Union, as the time charterer, was dated April 20, 1979. The JOLLY SPRITE time charter between New Caravel, as the bareboat chartered owner, and Elf Union, as the time charterer, was dated June 5, 1979. Exhs. 52 and 53. The time charters were entered into at approximately the time the construction contracts were entered into with Sasebo. Tr. 32–33. As of January 1, 1980, Somarelf was established as a separate corporation and succeeded to Elf Union's rights and obligations as the time charterers of the vessels. When Sasebo delivered the vessels to the owners, the owners in turn delivered them to Somarelf under the time charters. Tr. 36, 52. Both time charters provided for the monthly payment of hire to the vessel owners. Exhs. 52 and 53, clauses 8 and 44. Somarelf paid time charter hire for the HAPPY SPRITE to Astre's account in New York. Tr. 56–57. From delivery until the JOLLY SPRITE was transferred to British flag, Somarelf paid time charter hire for the JOLLY SPRITE to New Caravel. However, Somarelf paid part of the total hire to Penmarine in connection with repayment of financing for the vessel. Exh. 105. From February 1982, when the JOLLY SPRITE, renamed VIC BILH, entered British registry until assignment of the demise charter to Aquitaine in July 1988, Somarelf paid time charter to Elf U.K. Exh. 105.

18. The relevant time charters (Exhs. 52 and 53) both provide in pertinent part as follows:

CLAUSE 2

... Owners undertake that throughout the period of service under this charter ... they will comply with the regulations in force so as to enable the vessel to pass through the Suez and Panama Canals by day and night without delay.

CLAUSE 24

Owners warrant that at the date of delivery under this charter the vessel shall be of the provisional description set out in Form B dated [April 20, 1979 in the case of the HAPPY SPRITE and June 5, 1979 for the JOLLY SPRITE] attached hereto and signed by them and undertake to use their best endeavours so to maintain the vessel during the period of her service hereunder....

CLAUSE 40

This charter shall be construed and the relations between the parties determined in accordance with the Laws of England and any disputes arising under this charter shall be settled in accordance with the provisions of the Arbitration Act of 1950 or any statutory modifications or reenactment thereof for the time being in force....

CLAUSE 51

Vessel to comply with the following rules and regulations:

i) Suez Canal Navigation and Tonnage Regulations.

The time charters also provide that disputes between the parties are to be resolved by arbitration in London; however, this arbitration provision did not preclude the parties from resolving a dispute through settlement negotiations. Tr. 491.

19. A Form B is a document describing the particulars of a vessel and used in the formation of a charter party. The Forms B for both the HAPPY SPRITE and JOLLY SPRITE (Exhibits 54 and 109C) were prepared after execution of the time charters. Only the final Form B for the JOLLY SPRITE was admitted into evidence. It is undated and recites the Suez Canal gross tonnage as 49,616.32 and the net tonnage as 43,453.44, the same figures certified by ABS for the HAPPY SPRITE on November 20, 1980 and for the JOLLY SPRITE on March 24, 1981. Because the HAPPY SPRITE was a sister ship, Somarelf relied upon the JOLLY SPRITE's final Form B

for the particulars of both vessels under both time charters. Peiniau Dep. 88. Although the final Form B was prepared after execution of Somarelf's time charters and ABS's calculation of the net tonnage figures, those Suez Canal tonnage figures were incorporated into the time charters and constituted a warranty by the owners to Somarelf that the Suez Canal net tonnage figure was correct; the source of the tonnage figure unquestionably being ABS.

20. In vessel chartering, it is the obligation of the owner or the owner's managing agent to accurately describe and represent his vessel to the charterer, be it a time charterer (sometimes called a disponent owner) or a voyage charterer. In turn, the charterer relies upon the vessel particulars, including Suez Canal Tonnages, provide by the owner. Tr. 872–75. If a time charterer sublets the vessel, it is the time charterer's obligation to accurately describe and represent the vessel to his charterer. An owner or the owner's managing agent relies upon information, including Suez Canal tonnages, from his vessel's certificates when describing vessel particulars and representing his vessel to a charterer, and because of the special expertise necessary to perform the lengthy and complex calculations of vessel tonnages, including Suez Canal tonnages, an owner or the owner's managing agent relies upon his classification society to calculate and certify such tonnages. In sum, without the necessary certificates to rely upon for vessel particulars, including tonnages, shipping commerce, particularly the chartering of vessels, would be brought to a halt.

21. For example, in voyage chartering, the owner or time charterer seeks to recover in the freight paid by the voyage charterer the expenses of performing the voyage, including the expenses to transit the Suez Canal. Owners and charterers use the Suez Canal tonnage figures to estimate voyage income and expenses and rely upon the tonnage figures on the certificate when entering into charters. Tr. 847.

22. Worldscale is a periodic publication of freight rates between different world ports utilized by owners, time charterers, and voyage charterers in the voyage chartering of tanker vessels. It is utilized to calculate the freight that a voyage charterer pays to the owner or time charterer. Worldscale also provides for the voyage charterer's payment of certain fixed differentials intended to reimburse costs or extra costs payable by the owner or time charterer for calls at particular ports or for transits of the Panama and Suez Canals. The Worldscale Suez Canal differential is calculated by multiplying a dollar charge specified by Worldscale by a vessel's Suez Canal net tonnage and adding a "lump sum" charge also specified by Worldscale, based upon the vessel's deadweight (cargo carrying capacity) tonnage. The expenses covered by the Worldscale Suez Canal differential include: Suez Canal dues payable to the Suez Canal Authority, port and harbor dues, vessel agency fees, and an allowance for vessel operating costs during an assumed time to transit the Suez Canal. Tr. 75–79. The Suez Canal differential is paid to the owner or time charterer by the voyage charterer. The actual expenses for transiting the Suez Canal are paid by the time charterer or owner, as the case may be, and encompass a variety of expenses, one of which is the dues or tolls.

*Somarelf's Four Voyage Charters of the Vessels and Its Reliance Upon the Incorrect Suez Canal Net Tonnage*

23. In its capacity as time charterer, Somarelf entered into voyage charters for the HAPPY SPRITE and JOLLY SPRITE on four occasions.[1] Before entering into such arrangements, Somarelf would estimate the expenses of performing a proposed voyage charter and then compare that with the freight it would receive from the voyage charterer to determine whether the charter should be entered into. In connection with the four voyage charters involved in this case and the calculation of the Suez Canal differential, Mr. Louvard, Somarelf's chartering manager, testified: "My calculation was done on 43,000. This number was given to me from the operation department." Louvard Dep. 91. Had

1. There were six Suez Canal transits made in conjunction with the four voyage charters.

the correct SCNT been shown, it is reasonable to conclude that Somarelf might not have entered into one or more of the voyage charters. At the very least, a higher Suez Canal differential would have been charged to the voyage charters.

24. Somarelf chartered the HAPPY SPRITE to Petrolexport under a voyage charter dated December 23, 1980. Exh. 64. Mr. Louvard signed the voyage charter on behalf of Somarelf. Louvard Dep. 30–31. The freight rate agreed with Petrolexport was $25.45 per long ton of cargo, inclusive of the Suez Canal differential. Exh. 64, clause 6; Louvard Dep. 32. This is not the normal method of agreeing freight in a voyage charter. But in this case, because the intended voyage and discharge port were known, an exact cost calculation could be made, inclusive of the Suez differential. Louvard Dep. 32–33. However, the Suez Canal differential still played a part in Somarelf's estimation of the costs of the Petrolexport voyage charter, and, because of favorable market conditions, it appears that the freight charge for the charter could have been increased had Somarelf known of the higher, correct Suez Canal net tonnage figure. Louvard Dep. 97, 113–15. The higher figure was estimated by Louvard to be $2–3 a ton, although the $3.35 per ton Worldscale differential charge also is a reasonable estimate of the higher charge Somarelf might have obtained from Petrolexport. Somarelf's freight invoice under the Petrolexport voyage charter is dated January 19, 1981. Exh. 65. Petrolexport paid the freight on February 10, 1981.

25. The first voyage charter for the JOLLY SPRITE was between Somarelf and Soponata and is dated April 2, 1981. Exh. 73. The freight invoice from Somarelf's broker to Soponata is dated May 12, 1981. It includes a Suez Canal differential calculated by multiplying the incorrect SCNT of 43,453.44 tons by the applicable Worldscale charge of $3.35 per SCNT. Soponata paid part of the freight, including the Suez Canal differential billed by Somarelf, on June 9, 1981. In the case of the Soponata voyage charter, Soponata requested, through its broker, the exact SCNT so as to calculate the Suez Canal differential itself. In response to Somarelf's Operations Department's telex request of May 7, 1981, on the same date Fairfield Maxwell telexed the SCNT of 43,-453.44 based upon ABS's Suez Canal special tonnage certificate. Louvard Dep. 53–59.

26. Somarelf next voyage chartered the HAPPY SPRITE on January 27, 1983 to French BP. Mr. Louvard also executed that voyage charter on behalf of Somarelf. Exh. 67. Somarelf's "pre-invoice" to French BP (Exh. 159) calculates the Suez Canal differential on an SCNT of 43,454 tons at the applicable Worldscale rate of $2.70 per ton (Exh. 77, page M–5). Somarelf's freight invoice to French BP (Exh. 68, dated February 14, 1983) sets forth exactly the same Suez Canal differential. French BP paid Somarelf's freight invoice of February 14, 1983 on February 22, 1983.

27. Somarelf again voyage chartered the HAPPY SPRITE to French BP on March 1, 1983. Mr. Louvard also executed that voyage charter on behalf of Somarelf. Exh. 70. Both Somarelf's "pre-invoice" and its broker's invoice to French BP dated March 15, 1983 (Exhs. 160 and 71) set forth a calculation of the Suez Canal differential based upon the incorrect SCNT of 43,454 tons at the applicable Worldscale rate of $2.70. Louvard 63–65; Exhs. 160 and 71. French BP paid Somarelf's March 15 freight invoice on March 29, 1983.

28. In February 1982, when the JOLLY SPRITE was transferred from Liberian to British Flag and renamed the VIC BILH, ABS was engaged to survey the vessel, measure the vessel under the British tonnage regulations, and issue a British tonnage certificate. Tr. 261–76. Although the British and Suez Canal procedures for performing the underdeck tonnage calculation differ slightly, under both sets of tonnage regulations underdeck ballast tanks are to be included. Consequently, the underdeck tonnages under those different regulations should be almost identical. When the VIC BILH then transited the Suez Canal, the Suez Canal Authority apparently noticed the discrepancy between

the vessel's British tonnage certificate and Suez certificate.

29. On October 23, 1984, the SCA wrote to ABS concerning the VIC BILH, ex JOLLY SPRITE, as follows:

In checking the measurement of the underdeck of the subject vessel we noted that according to Suez Canal Special Tonnage Certificate dated on the 24th March 1981, the underdeck volume is 46622 ts.37 while the British Tonnage Certificate dated on the 18th May 1982 is 60273 ts.13.

Since the two documents mentioned previously were issued by A.B.S., we should be very grateful to know the reasons of such difference between them.

Thank you for an early reply.

Exh. 27. Mr. Boyle of ABS reviewed the files of the vessels and discovered the error in the underdeck tonnage calculation. He prepared a letter dated November 5, 1984 to the SCA for Mr. Doherty's signature which read as follows:

With reference to your letter (no. 4.1–84) of 23 October 1984, regarding the underdeck tonnage of the subject vessel, we have reviewed our files and wish to advise the following.

The number shown as underdeck tonnage (46622.37 tons) on the Suez Canal tonnage certificate is actually the Liberian national underdeck. This figure, representing the total tonnage less all water ballast spaces, was inadvertently entered on the Suez Canal certificate. Accordingly, the correct Suez Canal underdeck tonnage should be 60356.67 tons (also, the corrected Suez Canal gross would be 63350.62 tons with the final corrected Suez Canal net tonnage as 57187.74 tons).

We regret the error which was made when the vessel's Suez Canal tonnage was prepared and apologize for any inconvenience this may have caused. We trust the above will clarify the situation.

Exh. 28.

30. Somarelf was subsequently advised that the SCA sought supplemental dues for both the HAPPY SPRITE and JOLLY SPRITE. Somarelf contacted Fairfield Maxwell, which then contacted ABS. On January 8, 1986, ABS replied to Fairfield Maxwell and confirmed that an error had been made. Exhs. 29, 30. The increase in the Suez Canal net tonnage for which the SCA charged supplemental dues for both the HAPPY SPRITE and JOLLY SPRITE/VIC BILH was 13,734.30 tons, precisely the difference between the incorrect net tonnage of 43,454.44 and the correct net tonnage of 57,187.74 tons, both of which had been determined and certified by ABS. Peiniau 10–11, 15–16, 19, 22–25, 32–34; Exhs. 1, 2, 28, 47, 49, 229, 230.

31. On January 4, 1985, Somarelf authorized payment of FF 1,065,040.60 to the SCA in satisfaction of the supplemental (also called "complementary") invoices for the HAPPY SPRITE. The SCA supplemental invoices for the HAPPY SPRITE's nine transits of the Suez Canal are in francs and are all dated December 27, 1984. Of the nine transits, five were undertaken when the vessel was sub-chartered. Exh. 47. On February 14, 1985, Somarelf learned the SCA was charging supplemental Canal dues of FF 880,636 for all seven prior transits of the Canal by the JOLLY SPRITE/VIC BILH. Peiniau Aff. 28–30; Exhs. 42, 48. Of these transits, one was undertaken when the vessel was sub-chartered. The SCA supplemental invoices for the JOLLY SPRITE/VIC BILH's seven transits of the Suez Canal are in francs and are all dated February 14, 1985. Exh. 49.

32. In total, Somarelf paid to the SCA the sum of FF 1,945,677.51 for uncollected Canal dues for both vessels. The SCA did not charge interest on the supplemental Canal dues. The SCA determined the deficiency for each transit by reference to the Special Drawing Right ("SDR") charge per ton in effect at the time of the original transit and by reference to the franc—SDR rate of exchange in effect at the time of the original transit. Somarelf paid no more or less to the SCA than it would have paid had ABS's SCNT been correct from the outset. Tr. 302–03.

*The Somarelf-Fairfield Maxwell Settlement*

33. Mr. Clement of Somarelf's Operations Department, who was charged with

responding to the discovery of the error in the Suez Canal Special Tonnage Certificates, consulted with both Mr. Louvard and Mr. Fages about whether additional Suez Canal differentials could be recovered from the four voyage charterers. Both Mr. Louvard and Mr. Fages advised that recovery was not possible. This was subsequently confirmed by Mr. Elmslie of Richards Butler, who testified on matters of applicable English law. Louvard Dep. 65–66, 100–103, 106–108; Tr. 475–82. Given the relevant industry custom and also the elapse of time since the sub-charters, it is reasonable to conclude that it was indeed impossible to expect that Somarelf could recoup its supplemental Suez Canal expenses from the sub-charterers of the vessels.

34. Somarelf claimed against the owners through Fairfield Maxwell for the supplemental Suez Canal dues and the lost Suez Canal differentials. After discussions and exchanges of correspondence, Somarelf agreed that its claim was limited to the lost Suez Canal differentials because, in Somarelf's view, it was responsible for payment of the Suez Canal dues in any event. *See* Exhs. 173, 137, 122a, 122f, 139, 122d, 122, 122b, 140; Peiniau Dep. 37–39, 69–70, 100; Tr. 314–316, 319. The amount of the claim also varied until Mr. Peiniau replaced Mr. Clement in April 1987 and recalculated the claim in its present amount of $166,185, after which the complaint in this action was amended. *See* Exhs. 122a, 122d, 79, 129, 142, 166; Peiniau Dep. 40–45, 139–41, 174–77.

35. Somarelf believed that it had two avenues of recovery available to it: against the owners under the warranties contained in the time charters and against ABS di-rectly. Somarelf and Fairfield Maxwell agreed that ultimate responsibility for the error in Suez Canal special tonnage certificates rested with ABS. Therefore, a joint action was commenced against ABS in September 1986. By early 1988, Somarelf and Fairfield Maxwell began to consider a resolution of Somarelf's claim. The parties requested Richards Butler, a firm of English solicitors, to render an opinion on the owner's liability to Somarelf. The opinion confirmed the parties' view that the owners were liable to Somarelf for breach of warranty under the time charters. *See supra,* p. 446.

36. When settlement discussions began, the parties agreed that Somarelf's claim was limited to the lost Suez Canal differential payments from Somarelf's voyage charters of the HAPPY SPRITE and JOLLY SPRITE. Tr. 326–27, 333–36. The parties were uncertain as to the validity of the claimed lost Suez Canal differential for the Petrolexport voyage charter because the Suez Canal differential was not separately calculated. Tr. 378–79. The Court finds, however, that Somarelf could have been expected to have charged Petrolexport a higher freight rate if the correct Suez Canal tonnage had been known. *See supra,* p. 448.

37. A settlement amount of $200,000 was agreed to. The settlement was paid to Somarelf on August 24, 1988. The settlement took into account the lost Suez Canal differentials under the four voyage charters ($166,185) and interest on the lost differentials from the date of payment of the voyage charters until the date of settlement ($112,185.36), equaling claims of $278,370.36:

| Voyage C/P | Additional W.S. Differential | Date of Sub–Charterer's Payment | Average Rate +1% | Amount |
|---|---|---|---|---|
| HAPPY SPRITE 23 Dec. 80 | US$46,009.90 | 10 Feb 81 | 11.1% | US$38,373.01 |
| HAPPY SPRITE 27 Jan. 83 | US$37,082.60 | 22 Feb 83 | 9.47% | US$19,247.30 |
| HAPPY SPRITE 1 Mar 83 | US$37,082.60 | 29 Mar 83 | 9.45% | US$18,875.27 |
| JOLLY SPRITE | US$46,009.90 | 9 June 81 | 10.79% | US$35,689.78 |

| Voyage C/P | Additional W.S. Differential | Date of Sub-Charterer's Payment | Average Rate +1% | Amount |
|---|---|---|---|---|
| 2 Apr 81 | | | | |
| TOTAL | 166,185.00 | | TOTAL | US$112,185.36 |

Tr. 470–75; Exh. 114, pp. 5–6, as corrected by Exh. 115.

38. The Court finds that the settlement agreement was an arms-length transaction between Fairfield Maxwell and Somárelf and was not a "sweetheart deal." The corporate structures of Fairfield Maxwell, Somarelf and the relevant vessel owners are not so interrelated as to lead to a finding that the settlement agreement was improper or unwarranted.

39. ABS's claim that Somarelf received a "currency exchange benefit" because of delayed payment of the supplemental canal dues at a time of fluctuating exchange rates, Tr. 1104–1111, is unduly speculative and not supported by the record, which indicates Somarelf paid for the supplemental canal dues in French frances without any indication that any dollars were utilized. Exh. 107.

40. ABS's claim that Somarelf received an interest benefit by virtue of the deferred payment of supplemental canal dues, Tr. 1067–68, may be a reasonable assumption. However, even if an "interest benefit" of $42,461.12 is deducted from the amount of lost differentials plus interest ($278,370.36), the $200,000 settlement remains a reasonable one.

41. The $200,000 settlement between Fairfield Maxwell and Somarelf was reasonable under the circumstances.

## II. DISCUSSION

In an opinion filed on December 29, 1988, and as amended on February 7, 1989, the Court set forth the legal parameters of this action. *Somarelf v. American Bureau of Shipping*, 704 F.Supp. 59 (D.N.J.1988). In sum, the Court found that Fairfield Maxwell's settlement with Somarelf converted the action into one for indemnification by Fairfield Maxwell against ABS; that although Fairfield Maxwell could not press a claim for contractual indemnity, it could proceed on a theory of tort-based indemnity, *id.* at 63; that ABS's behavior potentially fell into the category of negligent misrepresentation as set out in § 552 of the Restatement (Second) of Torts, *id.;* and that Fairfield Maxwell could only prevail if its $200,000 settlement payment was found to be reasonable by the trier of fact. *Id.* at 64. Applying these legal principles to the above findings of fact, the Court now finds that plaintiff Fairfield Maxwell has successfully proven that it is entitled to indemnification by ABS for the $200,000 settlement payment made to Somarelf.

### A. Tort–Based Indemnification and ABS's Negligent Misrepresentation

■ The basic purpose of tort-based indemnification is to shift the burden of compensating the victim of a tort to the party who is principally, if not solely, responsible for the tort's occurrence. As the Court previously stated, tort-based indemnification

> has usually been available only where the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault. 'Passive negligence' has been limited to instances in which the indemnitee was vicariously or technically liable. Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate.

*Somarelf*, 704 F.Supp. at 63 (quoting *Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Authority*, 693 F.2d 1, 3 (1st Cir.1982) (citations omitted)). See also *M & O Marine, Inc. v. Marquette Co.*, 730 F.2d 133 (3d Cir.1984); *Maritime Overseas Corp. v. Northeast*

*Pet. Indus.*, 706 F.2d 349 at 351 (1st Cir. 1983); W. Prosser, *Law of Torts* at § 51.

▮ The owners of the HAPPY SPRITE and JOLLY SPRITE were liable to Somarelf by virtue of the warranties contained in the time charter agreements for the two vessels. *See supra*, p. 446. This liability is not only clear from the face of the time charters but also was determined by the Richards Butler firm of English solicitors. *See supra*, p. 450. Such liability, however, can best be characterized as merely a technical liability in the context of an action for tort-based indemnification.

ABS was the party that was actively at fault because it was ABS's miscalculation of the Suez Canal tonnage that directly led to the losses Somarelf suffered by undercharging for the Suez Canal differentials on its four voyage charters. The Court previously found that ABS's conduct fell into the category of the tort of negligent misrepresentation, which is set out in § 552 of the Restatement (Second) of Torts.[2] *Somarelf*, 704 F.Supp. at 63. Summary judgment in favor of plaintiff was withheld, however, because of uncertainty as to certain issues of fact material to the elements of a negligent misrepresentation claim. After a full trial, the Court is now satisfied that ABS's conduct did constitute negligent misrepresentation.

In order to sustain its claim of negligent misrepresentation, under § 552 of the Restatement (Second) of Torts, it was necessary for Fairfield Maxwell to prove that: (1) ABS in the course of its profession, supplied false information for Somarelf's guidance in a business transaction; (2) ABS failed to exercise reasonable care in gathering the information; (3) Somarelf relied on the false information in a transaction that ABS knew the information would influence; and (4) Somarelf thereby suffered pecuniary loss. *Somarelf*, 704 F.Supp. at 64 (citing *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.*, 826 F.2d 424, 429 (5th Cir.1987)).

At the time defendant brought its summary judgment motion, the Court found that the first two elements of negligent misrepresentation were all but factually settled matters. Evidence produced at trial confirms that ABS supplied an incorrect Suez Canal special tonnage certificate that the vessel owners and, in turn, Somarelf, needed for guidance in business transactions. *See supra*, p. 445. The evidence also confirmed that ABS failed to exercise reasonable care in preparing the Suez Canal special tonnage certificates and calculating the net tonnage figures.

ABS's mistake was not a matter of misinterpretation but was a plain "human" error in computation of a sort which had not occurred before. *See supra*, p. 445. The final responsibility for calculating and certifying the Suez Canal net tonnage figures for the HAPPY SPRITE and JOLLY SPRITE rested with ABS, and its failure to accurately do so constituted negligence. *See supra*, pp. 445–446.

In its previous opinion, the Court found that material issues of fact remained as to the third and fourth elements required to prove the tort of negligent misrepresentation. Thus, much of the evidence adduced at trial related to the issues of whether

**2.** Section 552 provides:

Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977).

Somarelf relied on the mistaken Suez Canal information in transactions that ABS knew the information would influence, and whether Somarelf thereby suffered pecuniary loss. The Court now finds both elements were proven at trial by a preponderance of the evidence.

Somarelf plainly relied on the Suez Canal figures when entering into voyage charters with Soponata and French BP. *See supra,* pp. 447–448. The Court also finds that Somarelf relied upon the Suez Canal information in conjunction with the Petrolexport voyage charter even though the Suez Canal differential was not separately calculated and invoiced. *See supra,* p. 448. Beyond the issue of Somarelf's actual reliance, it is also clear that Somarelf had a right to rely on ABS's figures by virtue of the warranties contained in the time charters. Although the time charters were negotiated before computation of the Suez Canal figures, the warranties, as well as the Form B, effectively incorporated the Suez Canal figures into the time charter agreements between Somarelf and the vessel owners. *See supra,* pp. 446–447.

On the issue of ABS's knowledge, plaintiff was not required to prove that ABS had specific knowledge of Fairfield Maxwell's intention to time charter the vessels to Somarelf, or of Somarelf's intention to voyage charter the vessels. What was required was proof that ABS, through its relevant employees, had knowledge and understanding of the importance of its national tonnage certificates and Suez Canal special tonnage to the maritime industry and specifically, that ABS, when issuing Suez Canal special tonnage certificates with no disclaimer and not specifically addressed to any single party, understood that parties such as time charterers and voyage charterers, as well as owners, would properly and foreseeably rely on the Suez Canal special tonnage certificates issued by ABS. *See supra,* p. 446. *Cf. Morse/Diesel, Inc. v. Trinity Industries, Inc.,* 655 F.Supp. 346, 358 (S.D.N.Y.1987). Plaintiff succeeded in meeting its burden of proof on this issue.

Finally, in regard to proof of pecuniary loss, the evidence clearly supports the proposition that Somarelf suffered financial loss as a result of ABS's negligence. The Suez Canal differential is based in large part on the special tonnage certificate and there is no question that Somarelf could have charged a higher differential to its voyage charterers had the correct net tonnage been known. *See supra,* pp. 447–448. Furthermore, such loss was in no way erased by any possible "currency exchange benefit" or interest benefit. *See supra,* pp. 450–451.

Therefore, with all four elements of the tort having been proven by a preponderance of the evidence, the Court finds that ABS's conduct constituted negligent misrepresentation.

## B. *Reasonableness of Fairfield Maxwell's $200,000 Settlement Payment to Somarelf*

Because ABS's conduct fell into a recognized category of tortious behavior, and ABS's actions were substantially responsible for Somarelf's injury, ABS is liable for tort-based indemnification to Fairfield Maxwell. Such indemnification, moreover, is not precluded by Fairfield Maxwell's settlement with Somarelf, as long as the indemnitee, Fairfield Maxwell, proves that it was actually liable to the party paid and that the settlement amount was reasonable. *M & O Marine, Inc. v. Marquette Co.,* 730 F.2d 133 (3d Cir.1984); *Whisenant v. Brewster–Bartle Offshore Co.,* 446 F.2d 394, 401 (5th Cir.1971).

The Court has already found that the vessel owners were liable to Somarelf by virtue of the warranties contained in the time charter agreements. *See supra,* pp. 446–447. As for the reasonableness of the $200,000 payment, the Court finds that the amount was reasonable given the circumstances of the entire course of events, and the Court accepts the testimony of Mr. Elmslie, the English solicitor who examined the situation and found the settlement to be reasonable. Tr. 487–90.

Somarelf, the vessel owners and Fairfield Maxwell were not sufficiently interre-

**454**

lated as to give rise to a presumption of a sweetheart deal, even when Penmarine's status as a SNEA subsidiary is taken into account. Furthermore, defendant's contention that Somarelf enjoyed a "currency exchange benefit" because of deferred payment of the tolls is unduly speculative. *See supra,* pp. 450–451.

Finally, defendant's contentions that Somarelf received an interest benefit from deferred payment of the tolls and that the interest amount of the settlement was overstated do not sufficiently cast doubt on the reasonableness of the settlement. These economic analyses are themselves somewhat speculative. More importantly, ABS's economic defenses do not attack the validity of the $166,185 amount of lost Suez Canal differentials. All that is brought into question is whether a $278,270.36 settlement would have been reasonable. However, even if ABS's interest rate theories are taken into account, the reasonableness of a $200,000 settlement is not disproved, particularly when it is considered that Somarelf may have had a valid claim, based on the time charter warranties, for the additional tolls paid on Suez Canal transits made for Somarelf's own account. Tr. 487–490. As the Court finds that the $200,000 settlement was reasonable, Fairfield Maxwell, as agent for the vessel owners, is entitled to tort-based indemnification from ABS.

C. *Prejudgment Interest and Costs*

 In addition to the $200,000 amount, plaintiff seeks prejudgment interest from the August 24, 1988 date of Fairfield Maxwell's settlement payment to Somarelf. The settled rule in admiralty cases is that prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable. *Matter of Bankers Trust Co.,* 658 F.2d 103, 108 (3d Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982). These exceptional circumstances exist only if there has been: (1) unreasonable delay in prosecuting the claim, (2) a bad faith estimate of damages that precluded settlement, or (3) no actual damages

sustained. *Id.* The Court finds none of these circumstances are present in this case and will therefore award prejudgment interest.

As a prevailing party, plaintiff is entitled to costs under Fed.R.Civ.P. 54(d). The Court will not, however, order that witness fees be taxed in excess of the statutory amounts mentioned in General Rule 23G(1) of the United States District Court for the District of New Jersey.

### III.  CONCLUSION

Judgment will be entered in favor of plaintiff in the amount of $200,000 plus prejudgment interest from August 24, 1988 calculated at the statutory rate. Costs will be awarded to plaintiff as set forth in General Rule 23G(1).